[Crim. Nò. 4664. In Bank. Dec. 14, 1945.]

THE PEOPLE, Respondent, v. JACKSON M. WEATHER-
FORD, Appellant.

Morris Lavine for Appellant.

Robert W. Kenny, Attorney General, Frank Richards, Deputy Attorney General, Fred N. Howser, District Attorney, Jere J. Sullivan, Robert Wheeler and J. Miller Leavy, Deputies District Attorney, for Respondent.

Frank C. Collier as Amicus Curiae on behalf of Respondent.

CARTER, J.—Defendant appeals from a judgment of conviction entered upon a jury verdict finding him guilty of the murder on April 5, 1943, of Mary Annette Struck, and fixing his punishment at life imprisonment. He contends that numerous errors were committed in connection with the charge to the jury, that material evidence was erroneously excluded, and that the evidence adduced is insufficient to support the verdict.

Since the first two points seem to be well taken, it is unnecessary to pass upon the sufficiency of the evidence. The facts, however, must be considered in some detail because it is apparent from the circumstantial nature of the evidence and the conflicting inferences which may be drawn therefrom, that a very close case is presented, and, therefore, any error committed by the trial court which materially affected the substantial rights of defendant and might have resulted in a miscarriage of justice, must be deemed prejudicial and ground for reversal (*People* v. *Albertson*, 23 Cal.2d 550 [145 P.2d 7] ; *People* v. *Dail*, 22 Cal.2d 642 [140 P.2d 828] ; *People* v. *Silver*, 16 Cal.2d 714 [108 P.2d 4] ).

About two weeks after the murder, defendant reported to the police that he had just discovered the body of the victim in the cafe which she occupied as his tenant. But from the circumstances there has been woven a web of suspicion assertedly strong enough to support the conclusion that defendant was the perpetrator of the crime. The facts and circumstances fall into three time classifications: 1. Occurrences prior to April 5, 1943, supposed date of murder; 2. Occurrences between April 5 and April 18, 1943, date of defendant's

reported discovery of the body; and 3. Occurrences between April 18 and November 3, 1943, date of defendant's arrest.

*1. Occurrences prior to April 5, 1943.*

Defendant was born in 1874 in Athens, Alabama, the son of a minister. He helped with farming and had some schooling, in all about the equivalent of a grammar school education. At the age of 26 he married, and although he and his wife have lived apart at times, the marriage still endures and they have a son and grandson. Except for his present predicament, defendant has never been arrested or been in any trouble whatsoever.

In 1909, after working at various trades, railroading and carpentry, defendant came to Southern California. Since 1922 he has been interested in building construction and real estate in Highland Park, Los Angeles. At the time of trial he was 70 years of age, and had a rental and property income of from $700 to $1,000 a month. About three years previously he had built a small restaurant called Oh! Johnnies Cafe, located on the southwest corner of North Figueroa Street and 100 N. Avenue 50, Los Angeles, and a year and a half later he had built the Hurry Back Cafe in the same vicinity. He owned the nearby Weatherford Apartments, and also a residence located about 20 feet south of Oh! Johnnies Cafe, with its front window facing the rear storeroom window of the restaurant.

In the spring or early summer of 1942, defendant met the homicide victim, a Mrs. Struck, who ran a small restaurant on Avenue 26. She was a German alien, then 53 years of age, of normal health, and had come to this country 35 years previously. On November 1, 1942, Mrs. Struck inserted in the Los Angeles Times a personal or "lonely heart" ad reading, "LONE LADY of means, meet refined business man, 50-60. Box Y 110 Times." On November 2, 1942, defendant, then living separate from his wife, wrote in reply to the ad: ".... I am alone and lonesome. I have plenty but it does not keep me from getting lonly, I am 60 and am very active, have a 42 Dodge Coup. If you wish phone me after 7 P. M. or better write me. Yours very truly ...." Defendant claims that he never received an answer to this epistle and that until the fact was disclosed by the murder investigation, he never knew that the ad he answered was that of Mrs. Struck. Mrs. Struck ran the ad three or four times in a year, and replies from other men were found among her effects.

The man for whom defendant built the Oh! Johnnie's Cafe, and who was renting it at $25 a week, became ill, and the business was turned over successively to others, one a drunkard who disappeared after defendant had refinanced him to the extent of $130. In repossessing the property defendant refused to pay back wages of $135 claimed by a cook named Jack Branham, known as Three Finger Jack. Defendant states that a vegetable or groceryman told him of a woman who was looking for a new location and suggested a "lady cook." This woman turned out to be Mrs. Struck.

Later, in November, 1942, and about the time of his negotiations with Mrs. Struck, defendant moved into his residence back of the Oh! Johnnies Cafe. His wife, with whom he was again living, helped him fix it up. However, the wife still kept her apartment over the Hurry Back Cafe and stayed there at times. About the first of December, 1942, defendant moved Mrs. Struck into the cafe. He signed a written agreement for rental to her of the cafe and equipment for five years at a rental of 7 per cent, later reduced to 5 per cent, of the gross earnings, payable monthly, the tenant to pay all water, gas, power, light, license and operating expenses and to keep the place in good repair. The restaurant was equipped with two ice boxes. Mrs. Struck brought in two more, together with a steam table, hot plate, and fireless cooker. She also brought a trailer which she parked alongside of the building. Defendant was in and around the cafe almost every day and helped Mrs. Struck install her equipment. He generally parked his car in the lot to the west or in a lot between his house and the Weatherford Apartments.

Mrs. Struck opened the cafe for business the latter part of January, 1943. Her operation of the restaurant was not profitable and defendant soon wanted to get her out. One Steve Salatich, an experienced restaurateur and operator of three cafes in the locality, had known defendant for ten or twelve years and had heard that Oh! Johnnies was for lease. He approached defendant in late January or early February, 1943, and offered to rent the place for $60 a month for three months and $75 a month thereafter. Defendant accepted the proposal and agreed to ask Mrs. Struck to vacate. He reported back to Mr. Salatich that she had consented to go, but that she wanted a few days to get rid of the food she had on hand. Salatich arranged for Three Finger Jack to work as cook after he took over the cafe.

Several conversations were had by Mrs. Struck, defendant, and Salatich. In fact, Salatich talked to defendant personally or on the telephone almost every day and also talked with Mrs. Struck. He was eager to effect the change but Mrs. Struck was slow in taking action to vacate. On February 12, 1943, defendant stated he thought that things "looked kind of funny" at the cafe and for that reason he and his wife "broke up and moved over on Colorado Boulevard," although defendant still stayed part of the time in the apartment over the Hurry Back Cafe. Defendant claims that all of his dealings with Mrs. Struck were purely business; that he had no social association with her; and no sentimental attachment for her. There is no evidence to cast doubt upon this assertion.

On February 13, 1943, defendant rented the rear residence to a family named Farmer, and to them he made various complaints about Mrs. Struck and her reluctance to move. On February 15, 1943, he filed a suit against her for rent in the small claims court; on February 17th, he gave her written notice to pay $48 rent for the month then ending, or to quit the premises. On February 26th, he gave written notice that on and after March 1, 1943, she would have to pay $7 a week rent in advance for trailer space. He claims that the purpose of the latter notice was to keep her from sleeping in the trailer in violation of health regulations and that he offered free parking for the trailer on the back of the lot. He also claims that Mrs. Struck was not angry with him for going to court; that in fact after the session was over and he had procured judgment against her, he drove her home in his car, helping her shop enroute. She did not keep any cash register tapes or records of the business transacted in the cafe. She paid defendant $11 about the time he went to court, supposedly as rental for January and part of February, and she paid another $11 in March. Other than these two payments, defendant received no rental from her.

In the latter part of February defendant reported Mrs. Struck to the O.P.A. for sugar hoarding, and exhibited to the authorities some sugar stored in his office which he said had been put there by Mrs. Struck. He repeatedly told the Farmers she was insanitary, dirty, and filthy, and asked them to report her to the Health Department for sleeping in the trailer. He used the telephone in the Farmer house to make complaint himself in their name. He also called personally on the authorities. Some investigation was made by an inspector who told

Mrs. Struck that she could not live in the trailer, but a week later he found her still living there. Defendant put a padlock on the trailer door. He claims that this was done at her request to keep her from violating the health regulations but that she later accused him of locking her out.

The Farmers testified that defendant told them, pounding his fists, that he would do "anything" to get Mrs. Struck to vacate. He spoke against her to various other people, among them Three Finger Jack. This man testified that defendant offered to pay him double the amount of the old claimed debt if he would go down and get the lease from Mrs. Struck, but that he protested against stealing; that on another occasion defendant stated he would give him "$2500.00 to get rid of that woman . . . in any way that you can; get rid of her for good." Defendant denied these offers and several witnesses attested the fact that despite Three Finger Jack's protestations of respectability, his reputation is very bad. Defendant went to the police and accused Mrs. Struck of removing his equipment, dishes and silverware. The officers referred him to the city attorney.

Some time after the middle of March defendant told Salatich that he had bought Mrs. Struck out for $350. He exhibited a memorandum of sale bearing her acknowledgment of payment and purportedly listing certain articles reserved by her and excluded from the sale. Later, and about March 25, 1943, a moving man, under defendant's direction and with Mrs. Struck's cooperation, moved one of her ice boxes, which was included in the sale, from the Oh! Johnnie's Cafe to the Hurry Back Cafe.

During March also Mr. Salatich referred defendant to M. J. Dauk, a real estate broker, with whom defendant twice discussed the problem of evicting Mrs. Struck. He complained of her in anger, said she was beating the government on income tax and might be beating him. Mr. Dauk visited Mrs. Struck and told defendant that she would surrender her lease and equipment, which were worth $1,000, for $500, but that she would hold out one ice box. Defendant said that was more than the place was worth, but appeared to be disappointed rather than angry. Paul Farmer overheard an argument between defendant and Mrs. Struck wherein she refused to give back the lease to defendant and said she would get out when "good and ready," to which defendant replied that if she did not give him the lease he was going to do something desperate.

In the Los Angeles Times of March 16, 1943, Mrs. Struck inserted another "Lonely Lady" advertisement, and replies were found among her effects, one dated March 16th and another March 22d. A torn menu was also found, on the back of which she had apparently started to draft a reply to one of the writers. This note was dated March 18th, started, "Dear Sir: Your precious letter to hand . . . ," and gave her address and telephone number. Defendant claims to have seen men in the kitchen of the cafe and states that on one occasion several men, whom he suspected might be Nazi spies, were sitting around a table with documents on it and were speaking with a German accent.

Defendant claims that the last time he saw Mrs. Struck alive was on Sunday morning, April 4th, when he stopped by for coffee. At that time he heard a man's voice in the kitchen and there seemed to be loud talking. He says that although Mrs. Struck had promised to vacate on March 25th and had broken the promise, he had no argument with her, but on the contrary promised to bring her a gallon of shellac to replace some which she accused him of having taken from her; that Mrs. Struck then spoke of going away and mentioned Bishop where she had a sister.

In corroboration of these statements, defendant offered the testimony of a Miss Orpha Hayden to the effect that she had last seen Mrs. Struck on Saturday, April 3d; that Mrs. Struck had told her of getting the $350 from defendant in cash and placing it in a deposit box, and of her intent to give up the business and take her trailer up into the mountains; that she had invited Miss Hayden to accompany her. This evidence was excluded by the trial court, and the exclusion is an error relied upon for reversal of the judgment.

Defendant states that he passed the cafe at least twice on Monday, April 5th, with intent to deliver the shellac but found the place locked. He knew that the cafe was generally closed on Mondays. Mrs. Struck had had the locks changed so that he had no key by which he could enter. Although he claims to have left the shellac in his automobile, it was never found by the police. However, an item of such a purchase showed in his memorandum book.

Mr. Palmer, a regular customer of the cafe, last ate there on Monday evening, April 5th, about 8:30 p.m. He stated that Mrs. Struck sat between him and the cash register and had a cup of coffee. When he went back at 11 o'clock the next morn-

ing for breakfast, the door was locked. Defendant's tenant, Mrs. Farmer, last saw Mrs. Struck alive about 4:30 or 5 p.m. on the evening of April 5th. She was walking about a block from the cafe with four shopping bags full of groceries.

2. *Occurrences from the evening of April 5th to April 18, 1943.*

The apparent time of the homicide is fixed by the testimony of the Farmers' son Paul, a 15-year-old high school boy. On April 5th he delivered newspapers on his route and got home about 7:30 in the evening. His father, mother, and brother had gone out and he was alone in the house. Later while listening to the radio in the living room, the window of which faces the back storeroom window of the cafe, he heard "unusual noises" of "two people arguing." He looked out the window and could tell that one voice was that of Mrs. Struck and the other was that of a man. The argument continued for about 15 minutes. He could see Mrs. Struck; also a man's arm "about up to the elbow," "leaning up against the shelves there by the window." The man's arm was covered with a "medium gray" colored sleeve. He heard Mrs. Struck say, "No, no, no," with her hands "up in front of her." The boy then ceased to listen, but in two or three minutes he heard a "very noticeable scream." He then went into the next room, and although the lights were still on in the cafe and he could see the storeroom window clearly, "something black" had been put up in front of it. He immediately turned out all lights in the house and watched for about five minutes for someone to come out of the cafe. He saw no one but in five or ten minutes the lights went out in the cafe. He then became so frightened that he turned on all the lights in the house, locked himself in, and hid under the bed clothes. It was in this excited and fearful state that the rest of the family found him when they returned home about 11 p. m., and were forced to enter through a window. In passing the cafe, Mr. Farmer noticed that all lights were out, including the neon lighted clock which ordinarily was left burning, although defendant had repeatedly told Mrs. Struck that she should turn it off because of a possible blackout. Mrs. Struck was not seen alive by any witness after this night. The condition of her body, when found, indicated that she was probably killed about April 5th.

Defendant claims that on Tuesday night, April 6th, he had a telephone call in which a man's voice said that Mrs. Struck

would be back in a day or two; that about a week later the same voice called and said she was going to Bishop and it would be several days before she came back. Defendant knew that her former landlord, a man named Jones, was from Bishop, and says that he did not worry at first. Among the effects of Mrs. Struck were found two telegrams, one dated in May, 1941, from a Jones in Bishop to a Jones in Los Angeles, and one dated February 8, 1943, from the Jones in Los Angeles to Mrs. Struck.

Defendant denies having committed the murder or having hurt Mrs. Struck in any way. He claims that he was not inside the cafe on the evening of April 5th, that he was working at his place on Colorado Boulevard, and that he stayed there. Mr. Farmer testified that although the blackout cardboard had only been over the cafe window intermittently prior to April 5th, it was there permanently after that date, and that he once saw a gentleman over there that he thought was defendant's son, although he could not be positive.

Defendant passed the cafe nearly every day after April 5th. He claimed to have tried the front door a time or two and the back door at least once. He reported to Mr. Salatich that Mrs. Struck was away for a few days and that he had given her $50 more to get her out, to which Mr. Salatich replied that ''it was all right, whatever he paid I would stand half the expense. . . . We were just waiting for the lady to come back. She was supposed to be away.'' Defendant also said that Mrs. Struck ''was up to Fresno on some business and that she would be back on Tuesday and hand him over the keys.'' Defendant suggested having new keys made, but Salatich advised against this course, and recommended that defendant consult an attorney, and also that he confer with the police. Defendant talked over the telephone to Salatich's attorney who stated that as long as defendant was the landlord and had a bill of sale and there was no lease signed, he could go into the place.

On April 8, 1943, Patrick Shepheard, a boy who attended military school but lived nearby, was playing with another boy around the cafe. Looking in the kitchen window they could see something silver, which they thought was water, and they could hear it plainly running on dishes. They spoke of this to Mrs. Farmer, who was sitting on her porch. They opened the outer screen door of the cafe and also opened the inside door about three inches, but then ran away because they thought they were doing wrong. This door was securely shut and locked at the time of defendant's discovery of the body of Mrs.

Struck. Four or five days later when Patrick was again playing around the cafe, he peered in the same window and listened, but the water was no longer running. The water meter showed a greatly increased water consumption over the days in question, but not as much as would have been consumed had the water been running during the entire period from April 5th to April 18th at the volume fixed by the boy in a police test had after discovery of the murder.

Defendant insists that he turned the water off on April 18th after he had made his discovery of the body and called officers to the scene. Under the theory of police computations the water must have been turned off about April 9th. On the latter date defendant called on Mrs. Farmer to collect her rent, and seemed ill and nervous. He sat down to write out her rent receipt, contrary to his custom. He inquired as to Mrs. Struck's whereabouts and asked if any noises had been heard at the cafe. He said that in order to keep hard feelings down he had come to bring Mrs. Struck a gallon of shellac which she falsely accused him of losing. He did not complain about her as he had theretofore done.

On April 17th, at the suggestion of Mr. Salatich, the defendant called at the Highland Park Police Station, identified himself, told of his difficulties with Mrs. Struck, exhibited the memorandum of sale, and asked if he could force his way in, saying he did not want to get in any trouble. The police first said it was a civil case and that they had nothing to do with it, but later said, according to defendant's report to Salatich, that defendant should go ahead in and they would back him up.

On the following day, Sunday, April 18th, a neighbor, Mr. Dietz, claims to have seen defendant open the front door of the cafe about 7 or 7:15 a.m., and walk inside. Some doubt was cast upon the correctness of this witness' recollection of the exact date. Defendant's story is that he went to the cafe about that time on the morning of the 18th, but found the door still locked; that he returned about 9 o'clock and gained entry by taking a wire and unhooking the screen door, and then pushing the paper out of a broken pane in the solid door, and reaching through to unlock it. The condition of the screen door indicated this tampering with the wire.

On opening the door defendant saw the dead and partially decomposed body of Mrs. Struck and apparently was shaken by the sight. He states that he immediately drove to his apartment a few blocks away and telephoned the police. This call

came through about 9:35 a. m. Defendant's speech was at first somewhat incoherent. He identified himself and reported a "murder." When asked how he knew the woman was murdered, he said she was dead and that they ought to look at the body. Defendant then returned to the cafe and stayed there while the police investigated its condition. He claims that he then noticed that the water was running in the sink, and turned it off. He produced his memorandum of sale and suggested that the motive may have been to rob Mrs. Struck of the $350 he had paid her. In explanation of why he returned to his apartment to report his discovery, instead of telephoning from the cafe or some adjoining place, defendant stated that the phone in the cafe was dead when he tried to use it, and that he did not have a nickel change to put in any other phone. The police state that defendant said he wanted to "save a nickel," and they hold this remark against him. The wires of the wall telephone were found to be cut close to the instrument, but the cut was not observable upon casual observation. Defendant said he did not know this was what was wrong when he tried to use the phone.

The police officers found all windows in the cafe closed and all doors locked except the one by which defendant had gained entry. The rear window was covered by a piece of ply board. The cafe was well stocked with food and the ice boxes were filled with perishables. In the sink was an accumulation of water and dirty dishes. The general condition of the place showed no sign of preparations by the occupant to vacate but on the contrary indicated that she was interrupted while having a cup of coffee. Only her fingerprints on a not quite empty coffee cup were found in the place. A gas jet of the stove was turned on, but no gas was escaping. The gas was found to have been turned off at the outside meter with a wrench. Defendant at first denied, but later admitted turning it off on April 6th or on the 9th when he went to collect the Farmers' rent. His explanation was that he thought Mrs. Struck was away and knew she generally turned the gas off at the meter, that being easier and safer because of some defect in the inside equipment.

In the outside screen door were two holes, one rusty and one seeming to have been recently cut with a wire or similar object. On the storeroom floor was the large ball of newspaper which defendant said he pushed through the paneless aperture of the door. The body of Mrs. Struck lay in a corner of the storeroom. Although badly decomposed it showed that the

immediate cause of death was a compound depressed fracture of the skull, which could have been produced by "the blunt end of a hammer, although any instrument of similar shape could do that." No bloody garments, weapons, or other incriminating objects connecting defendant with the murder were found in his possession, nor did he at any time make any confession of guilt. Alongside of Mrs. Struck's body was a garden tool, a pronged hoe, but it was the opinion of the autopsy surgeon that death could not have been caused by this instrument. The several hammers possessed by defendant were examined, but none gave evidence of having been used in the murder. The police claim that one hammer mentioned by defendant was not found. His possessions were kept at his various properties and there is no showing of any attempt at concealment on his part. Deceased's trailer was found to be in good order. It was locked but not padlocked. The padlock was found in the cafe on a shelf under the dining counter. In the trailer were two beds without mattresses, and in the cafe restrooms were two mattresses. Personal papers of the deceased were found in various places in the cafe, including her alien registration card and the answers to her lonely lady advertisement. In a purse alongside her body was found a key to the front door. There was some money in the cash register, some money alongside of it, some in a saucer, and a few pennies on top of an ice box, less than $5 all told. In a purse in a shut drawer of the kitchen table was $26 or so in currency. A search failed to reveal any trace of the $350 which defendant claims he paid Mrs. Struck. One bank account in her name was found containing about $130, and also a parcel of real property. These assets, with clothing, furniture, and the like constitute her estate.

The police claim that defendant seemed to be very nervous while they were at the cafe, and that he was talking to himself. Defendant said the crime looked like robbery to him; later, when it appeared that the money had not been taken, he said that Mrs. Struck had boy friends; also that it looked like German alien enemies had come there.

*3. Occurrences between April 18, 1943, and November 3, 1943, date of arrest.*

On April 19th, defendant returned to the police the key to the cafe which they had given him on finding it the day before. On April 20th, defendant brought the officers a scrap of paper on which was printed faintly in pencil "Keep your mouth shut

or you will be *sorry*. I mean it." On the bottom defendant had written in scrip "over," and on the reverse side, "This was under my door Tue morning." Defendant said the note had been shoved under his door during the night and that he had had seven or eight telephone calls threatening his life. Handwriting experts attribute the entire note to defendant.

On April 21st defendant's written statement was taken by the police, at the conclusion of which he told them they were welcome to every key in his possession, and that they might search all of his properties. After this questioning defendant was released. On the next day, April 22d, defendant telephoned the police about 3 o'clock in the morning. They proceeded to his apartment where they found him in a state of excitement. He said that he had answered a knock at his door; that someone had struck him so that he became unconscious; and that when he awoke he found himself tied with a towel and with a burning quilt over his head; that he struggled free, put out the fire, and called the police. Nothing in the apartment seemed to be disturbed. The towel drawer was open. A quilt was partly burned, defendant's hair was singed slightly, and he had three or four little scratches on his forehead which looked as though they might have been made with a sharp instrument. A fully loaded revolver was also found. Defendant stated that his assailant was probably a man who had been calling him on the phone during the past week, possibly one of the men he had seen around the table with Mrs. Struck.

Defendant was taken to the hospital. On the way he was continually pinching and twisting his cheek. But the doctor, after an examination, said he could find nothing to indicate that defendant had been unconscious. Defendant was placed under arrest and after further questioning finally said he would talk no more about the matter. Around 2 or 3 o'clock in the afternoon of the same day he is said to have admitted that both his story and the previous story of finding a note under his door were fabricated. On the trial, however, he testified to the events as true and said he had never told the police that they were a hoax; that under the pressure of continued questioning and the threat of five policemen standing over him as if about to jump on his stomach, he had merely said, "Have it your own way." He said he had lost about 20 pounds and had not slept for six weeks.

The police found two copies of the so-called bill of sale whereby Mrs. Struck sold defendant certain articles for $350, and reserved others. One copy, in indelible pencil, made no reservation by Mrs. Struck of her remaining ice box; the other copy, in plain pencil, made the reservation by listing "smalest Frigidare," where the indelible pencil copy listed "smaller Table." Both contain the purported signature, "O K M. A. Struck." Defendant claims that the memorandum in plain pencil was prepared by him as a copy of the original for his files, and that Mrs. Struck signed the original. It is the theory of the prosecution, supported by the testimony of handwriting experts who studied the papers thoroughly and tested them with infra-red rays, that the indelible writing on the one was substituted by defendant for what was originally on the paper; that the signature "O K M. A. Struck" was traced by defendant in indelible pencil over Mrs. Struck's genuine signature; and that by means of this forgery defendant planned to get possession of the remaining ice box which Mrs. Struck intended to reserve from the sale. Defendant did not offer any expert handwriting testimony in rebuttal. The experts also testified that defendant was the author of both the handwriting and the printing on the "I Mean it Note," with which the police claim he perpetrated a hoax upon them.

Although only the fingerprints of Mrs. Struck were found in the cafe, defendant told the police his prints would also be found. In a conversation with the police on April 26th, he stated that he had used the garden tool found alongside Mrs. Struck's body to clean out the sewer pipe and that his fingerprints would probably be found on it. When the police stated an intention to take scrapings from under his finger nails and test them for blood, defendant said he had cut himself while shaving about two weeks previously and they would find blood under the nails of his right hand; that he also cut himself on the left side of the neck at the same time, so they would also find blood under the nails of that hand. The prosecution claims that these previous incredible, and too eager explanations are clearly indicative of guilt.

On November 3, 1943, after the grand jury had reopened investigation of the case, as defendant knew, the police looked for defendant all day and at night. They placed a small piece of wood in the jamb of the door leading to defendant's apartment over the Hurry Back Cafe, so they could tell if the

door was opened. When they returned on November 4th, the wood had fallen out but they could get no reply to their poundings. When they went inside they finally found defendant running across the top of the roof 25 to 30 feet away. Defendant turned and said, ''Don't shoot; don't shoot. I thought it was holdup men.'' It is the theory of the police that defendant had been anticipating his arrest, and preparing for flight. They found pencil notes on which he had written ''Tell the attorney to get an enjunction against disturbing that box'' (apparently referring to the second ice box of Mrs. Struck, and had listed such items as ''Pay gas Pay water. . . .'' Defendant was carrying $1,149.49 in cash. He claimed that to carry so large a sum was not unusual for him. When asked if he was preparing to leave town, he denied any such plan but stated he was leaving the notes for his wife.

The prosecution finds convincing proof of defendant's guilt in the many questionable occurrences before and after the homicide. Among other things are these: The many complaints made by defendant against Mrs. Struck prior to April 5th, and his constant efforts to get her to vacate, as contrasted with his change of attitude after April 5th, when complaints ceased and he expressed anxiety about giving her a gallon of shellac. He seemed to be unusually patient over the length of her supposed absence. The man whom Paul Farmer states he heard threaten Mrs. Struck had a gray coat sleeve. Defendant wore a gray coat on week days. Between April 8th and 18th the cafe door which the boy Patrick says was unlocked became locked, and the water faucet was turned off. Defendant first denied and then later admitted turning off the gas. The neon clock was off after April 5th. Defendant showed that he knew how to enter the cafe by making use of the paneless aperture in the rear door. He could have left by the self-locking front door without leaving trace of his entry. Defendant, being a carpenter, might naturally choose a hammer as a weapon. Defendant is said to have been seen actually entering the cafe about 7 o'clock in the morning of April 18th, whereas he says he merely tried the door. He did not report his alleged discovery of the body until two hours later. Defendant was nervous with the police and promptly propounded his robbery and German spy theories. He is supposed to have forged the victim's signature on the memoran-

dum of sale. He attempted by the alleged hoax acts to divert suspicion to others. He allegedly planned to evade arrest.

None of these incriminating circumstances are left without some explanation or contrary theory advanced by defendant. He pleads his good record, ample income, absence of any evidence directly connecting him with commission of the crime, absence of motive other than perhaps to repossess the cafe more quickly and secure the ice box, his age and nervousness under pressure of police questioning.

After a prolonged trial the case was given to the jury at 10 a. m., February 14, 1944. They deliberated that day, and on February 15, 16 and 17th. On the 17th, the testimony of Paul Farmer and that of defendant were reread to the jurors. On February 18th, a juror became ill and an alternate was substituted in her place. Deliberations were then continued for the remainder of that day and, after two days' recess, were resumed on Monday, February 21st. At 3:09 p. m. a verdict of guilty was returned, with recommendation of life imprisonment.

At some time during the deliberations, according to an affidavit of the bailiff, the forewoman requested him to ask the judge "Whether or not it was the duty of the prosecution or the defense to put the defendant on the scene." The bailiff relayed this question to the trial judge and was told by him to advise the jury "that they were not concerned with anything that was not in the evidence or the law as given to them by the court." The bailiff so advised the forewoman in the presence of the other jurors, whereupon one juror said to the bailiff, "In other words, the rest of it isn't any of our business," and the bailiff replied, "I guess that's it." Affidavits of some of the jurors aver that the question asked was "whether it was incumbent upon the prosecution to show the whereabouts of the defendant on April 5, 1943, or whether such duty rested upon the defense," and that when the bailiff apprised them of the court's reply one juror said, "In other words, its none of our business," to which the bailiff replied, "That's just about it." Defendant's attorneys were not present during this procedure and were not advised of what had taken place.

This instruction of the jury through the agency of the bailiff was obviously violative of the procedure prescribed by sections 1138 and 1043 of the Penal Code. The section first cited

provides that "After the jury have retired for deliberation, if there be any disagreement between them as to the testimony, or if they desire to be informed on any point of law arising in the cause, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given in the presence of, or after notice to, the district attorney, and the defendant or his counsel, or after they have been called." Section 1043 states that "If the prosecution be for a felony the defendant must be personally present at the trial."

In denying defendant's motion for a new trial the court refused to consider the affidavits of the jurors on the ground that they could not by such means impeach their own verdict. Defendant appealed only from the "judgment and sentence"; not from the order denying a new trial. Upon the appeal from the judgment, however, any error in connection with the charge to the jury may be reviewed (Pen. Code, § 1259). Even assuming that the courts of this state are committed to the minority rule that, without recognition of any exception relating to improper extraneous influences, misconduct of the officer in charge of the jury, or improper communications of the judge, the affidavits, testimony, and depositions of jurors are inadmissible to impeach their own verdict (*Maffeo* v. *Holmes*, 47 Cal.App.2d 292, 295 [117 P.2d 948], and cases cited; *De Garmo* v. *Luther T. Mayo, Inc.*, 4 Cal.App.2d 604 [41 P.2d 366]; 20 Cal.Jur. p. 61, § 41; 90 A.L.R. 249; 146 A.L.R. 518), nevertheless in the present record there remains a sufficient foundation for presentation of the point upon the uncontradicted affidavits of the bailiff and of counsel for defendant.

 But respondent contends that even if the communication by the judge through the bailiff to the jury was improper, it did not affect the substantial rights of the defendant or constitute prejudicial, reversible error (Const., art. VI, § 4½). Whether error of this character is prejudicial must in the last analysis depend upon the particular facts of the individual case. Among the cases relied upon by respondent in which such error was found to be nonprejudicial is *People* v. *Alcalde*, 24 Cal.2d 177, 188, 189 [148 P.2d 627], which illustrates the factual distinction. There the foreman of the jury sent the judge a note asking "May we render a decision of life imprisonment *and not eligible for parole?*" The judge returned the paper with the notation "The answer is 'No'."

This court, after commenting upon the impropriety of the procedure, said: "But in this instance the court could not have responded by any other answer than 'No' or its equivalent, namely, that the jury was to be guided solely by the instructions already given. The answer of the trial judge could properly have been made over the objection of the defendant or his counsel if the ordinary procedure had been followed. The episode may not be deemed to be prejudicial, and would therefore not justify a reversal of the judgment or of the order denying the motion for a new trial." However, it is also said that "courts are practically unanimous in holding that private communications between court and jury are improper, and that all communications should be made in open court. (*Dodge* v. *United States,* 258 F. 300 [169 C.C.A. 316].)"

The present case is one in which the practice in question must not only be condemned, but must be held to have constituted reversible error. Here there was not, as in the Alcalde and like cases, overwhelming evidence of guilt. On the contrary the evidence of defendant's connection with the murder is largely circumstantial. The possibility of his presence at the scene of the crime, assuming that it was committed on the evening of April 5th, rests upon the testimony of a frightened fifteen-year-old boy who merely observed a gray coatsleeve and an unrecognizable man's voice. No bloody garments, weapons, or incriminating objects were found in defendant's possession. There were no confessions of guilt. Many of the alleged incriminating circumstances are as consistent with innocence as with guilt. Where evidence is such that the jury could reasonably have arrived at opposite conclusions therefrom, a definite error in procedure may well be sufficient to turn the scales against a defendant who, without the interposition of such error, might be acquitted.

The question upon which the jurors sought the advice of the trial judge was a pertinent one—whether it was incumbent on the prosecution or the defense to show the whereabouts of the defendant at the supposed time of the murder. The reply sent in to the jury room seems to have been interpreted as meaning that the matter was none of the jury's business. This was clearly incorrect. The question touched upon the subjects of burden of proof and presumption of innocence. It indicated that the jurors were in grave doubt, and unaware of the fact that it was not essential to acquittal for defendant

to establish an alibi. To instruct the jury in effect that the whereabouts of defendant at the time in question were "none of their business" was to misadvise them on one of the most vital phases of the case. Both the charge and the procedure employed in delivering it constituted reversible error under the circumstances of this case.

 The phrase "miscarriage of justice" (Const., art. VI, §4½), as said in *People* v. *Wilson,* 23 Cal.App. 513, 524 [138 P. 971], "does not simply mean that a guilty man has escaped, or that an innocent man has been convicted. It is equally applicable to cases where the acquittal or the conviction has resulted from some form of trial in which the essential rights of the people or of the defendant were disregarded or denied. The right of the accused in a given case to a fair trial, conducted substantially according to law, is at the same time the right of all inhabitants of the country to protection against procedure which might at some time illegally deprive them of life or liberty." (See, also, *People* v. *Albertson, supra,* at p. 553; *People* v. *Dail, supra; People* v. *Silver, supra.*)

 Defendant contends that it was prejudicially erroneous to exclude the proffered testimony of Orpha Hayden. That witness testified that she lived across the street from Mrs. Struck and saw her practically every day; that she last ate at the cafe on Saturday, April 3d at 1 p. m.; that she then went down town and when she returned there was a "back later" sign on the door; that at 6 p. m. she went by the cafe and the sign was down, but looking through the glass she saw coffee and peas at the end of the counter where Mrs. Struck customarily sat to fix vegetables; that thereafter she inquired every day for Mrs. Struck but never saw her again.

An offer of proof was then made that the witness would further testify that she "had a conversation with Mrs. Struck about two weeks before April 3rd, at which time Mrs. Struck told her that she sold Mr. Weatherford an ice box and other trinkets in Oh Johnnie's Cafe for $350.00; that she received $350.00 in cash from Weatherford; that she asked Mrs. Struck whether Weatherford paid her in cash or check, and she said that he had money in a money belt. Then the witness asked Mrs. Struck why she kept money around there in such large amounts, and Mrs. Struck replied that she deposited that money in a safe deposit box in a bank. This witness will fur-

ther testify that Mrs. Struck told her that she was going to leave Oh Johnnie's Cafe, give up the business there, in two weeks, because she had sold out her interest in there to Mr. Weatherford. . . . Yes, this witness will further testify that Mrs. Struck told her because she sold her business and was through down there she was going to take her trailer and go in the mountains, and invited the witness to be with her, spend some time as a friend, take a rest.''

It will be noted that the proffered testimony falls into two categories: (1) Declarations of the deceased victim relative to selling out to defendant for $350, and (2) Declarations relative to her intent to go into the mountains.

That the evidence is hearsay is not denied; hence, it is admissible only if there appears to be a necessity for that type of evidence and a circumstantial probability of its trustworthiness (V Wigmore, p. 202, § 1420), and if it falls within an accepted exception to the hearsay rule. All of these elements are present. The death of the declarant creates the necessity for resort to hearsay and the declarations, being those of a present existing state of mind, made in a natural manner and not under circumstances of suspicion, carry the probability of trustworthiness. (VI Wigmore, § 1725, p. 80.)

The decedent's declarations concerning the selling of her cafe interest and receipt of $350 in cash were admissible under the exception to the hearsay rule which permits evidence of declarations by one in possession of property characterizing his possession and statements of money receipts (V Wigmore, § 1460, p. 265, § 1476, p. 281; 31 C.J.S., § 247, p. 997; § 219, p. 963), or, as codified in this state: ''The act or declaration of a deceased person done or made against his interest in respect to his real property'' (Code Civil Proc., § 1870(4); 10 Cal.Jur. pp. 1097, et seq.).

The decedent's declarations concerning her intended trip into the mountains were admissible under the exception to the hearsay rule which covers evidence of intent. The trial court recognized that a deceased victim's declarations of the existence of a design, plan, or intent to do an act are admissible as evidence of the probable doing of the act, for in rejecting the evidence he said: ''So far as declarations as to where she intended to go, the intent of the deceased is not in issue, because there is no evidence as to her having gone anywhere. If she had left, had been seen going away, and driven away in the trailer, there might possibly be a basis upon which the

evidence as to her intent to go some particular place, or the purpose of going might be admissible. But we haven't any- thing to predicate that on.''

In so ruling, the trial court unduly restricted the ex- ception. The declarations of the intent are admissible not only as evidence of the probable doing of the act, but also as evi- dence of the intent itself even if the act has not been done. As said by Mr. Wigmore, ''But, as a condition of mind, the plan or design may also, it is clear, be evidenced under the present Exception by the *person's own statements* as to its existence.'' (VI Wigmore, § 1725, pp. 79, et seq.; see, also, 20 Am.Jur. §344, p. 319; 31 C.J.S., § 256, p. 1007; 10 Cal.Jur. p. 1073, § 315.) In *People* v. *Alcalde,* 24 Cal.2d 177 [148 P.2d 627], the deceased victim had declared her intention to go out with ''Frank,'' which was the name of the defendant, and the declaration was held to be admissible as proof that the inten- tion was probably carried out. The opinion in that case, how- ever, also reviews authorities (pp. 185-187) wherein decedent's declarations of intent were admitted to show merely the in- tent itself, regardless of whether it was carried out. In *People* v. *Selby,* 198 Cal. 426 [245 P. 426], for example, declarations were admitted to show a condition of mind to refute the sui- cide theory, but not to show the motive of defendant. In *New York Life Ins. Co.* v. *Mason,* 272 F. 28, involving death by gunshot, the deceased's expressions negativing an intention of suicide were held admissible, and many similar cases may be found. The only elements essential to admissibility are, as stated in the Alcalde case, ''that the declaration must tend to prove the declarant's intention at the time it was made; it must have been made under circumstances which naturally give verity to the utterance; it must be relevant to an issue in the case.''

That both the declarations relative to the $350 and those relative to the intended trip are relevant to the main issue in the case, that of defendant's guilt, is obvious. The declara- tions of payment of the $350 rebut the theory that defendant may have killed Mrs. Struck for her equipment or interest in the cafe, and forged a receipt. Mrs. Struck's admission that defendant paid by taking money from his money belt, is strong corroboration of his own testimony. If defendant bought Mrs. Struck out, she must have intended to vacate the cafe, and he must have known of that intent. Thus, these motives for the murder are eliminated. Furthermore, if Mrs. Struck re-

ceived the $350 and it was not found after the killing, robbery may have been the motive of some killer other than defendant. Similarly, proof of intent to go into the mountains rebuts the theory that defendant killed Mrs. Struck to get her out of the cafe. It is also susceptible of the inference that she intended to vacate and that in contemplation of the trip she may have had more money in her possession than that discovered with the body. These inferences rebut the prosecution's theories of motive.

This case is the converse of the Alcalde case. There the evidence of intent led to an inference of identity of the defendant as the murderer; here the evidence of intent leads to the inference that defendant lacked any motive and may not have been the murderer. ▪ Although it is true that when the perpetration of a crime has been brought home to the defendant, the motive for its commission becomes unimportant (*People* v. *Planagan*, 65 Cal.App.2d 371 [150 P.2d 927], nevertheless, the "absence of motive tends to support the presumption of innocence"; it is "a fact to be reckoned on the side of innocence" (*People* v. *Albertson*, 23 Cal.2d 550, 557 [145 P.2d 7], and cases there cited). Thus, the intention here of the deceased, bearing on the matter of motive, was clearly relevant to the issue of guilt, and the ruling of the trial court excluding evidence of such intention was prejudicial.

The judgment is reversed, and the cause is remanded for a new trial.

Gibson, C. J., Shenk, J., Edmonds, J., Traynor, J., and Spence, J., concurred.

SCHAUER, J.—I concur in the judgment upon both of the two principal grounds discussed in the opinion: (1) That is was error to, "*in effect,*" instruct the jury through the bailiff that it was "none of their business" as to whether the burden of proving the whereabouts of the defendant at the time of the crime rested upon the defendant or the People; and (2) that it was error to exclude the proffered hearsay testimony of the witness Hayden concerning admissions of the decedent against her interest in property and declarations of the decedent as to her intent to leave the premises.

In making such rulings, however, it seems but fair to the trial judge to note that as to error number 1, while the procedure was technically irregular and such irregularity pro-

vided the opportunity for the prejudice in the incident, the real mischief arose through the construction seemingly placed upon the message by the jurors and acquiesced in by the bailiff rather than from the inherent meaning of the language which, it is asserted, was actually authorized. The assertedly authorized message—that the jurors "were not concerned with anything that was not in the evidence or the law as given to them by the court"—was not technically inaccurate. A reference to the instructions shows that the jurors had been properly instructed as to the burden of proof. The incident emphasizes the wisdom of the rule which forbids informal communication with jurors after a case has been submitted to them. (*Cf. McDowd* v. *Pig'n Whistle Corp.* (1945), 26 Cal.2d 696 [160 P.2d 797], wherein, by a divided court, it was held that jurors could be permitted to separate after submission of the cause, thus creating opportunity for entirely unsupervised informal communication with each of them.) And as to error number 2, insofar as concerns excluding the hearsay statement of the decedent declaring her intent to vacate the premises, we today rely strongly upon *People* v. *Alcalde* (April 26, 1944), 24 Cal.2d 177, 185 et seq. [148 P.2d 627], which case has been decided since the trial in the case at bar.