22 Cal.Rptr. 649, 372 P.2d 641]

[Sac. No. 7398. In Bank. June 19, 1962.]

RICHARD J. PAULSON, Petitioner, v. THE SUPERIOR COURT OF EL DORADO COUNTY, Respondent; THE PEOPLE, Real Party in Interest.

Lynn Carman for Petitioner.

No appearance for Respondent.

Stanley Mosk, Attorney General, Doris H. Maier, Assistant Attorney General, and Nat A. Agliano, Deputy Attorney General, for Real Party in Interest.

TRAYNOR, J.—In this proceeding in prohibition petitioner seeks to preclude his trial on two counts of grand theft on the ground that the trial would twice put him in jeopardy in violation of article I, section 13 of the California Constitution.

On December 18 and 19, 1961, petitioner was tried by a jury on two counts of grand theft. The jury retired at 4:12 p.m. on December 19 and returned to the courtroom at 9:05 p.m. When the court asked if the jury had arrived at a verdict, the foreman replied, "Your Honor, we have not reached a verdict. We have some questions that we would like to ask and advice from the Court if we may?" The first question,

relating to Count 1, was whether a charge of theft is nullified if the victim agreed to accept weekly payments as restitution. The court reread an instruction that restitution is not a defense. The second question, relating to Count 2, was "would negligence in the care of the funds, whereby another person may have stolen the money still leave the Defendant responsible and guilty of theft?" The court answered: "Well, Mr. Foreman, we are here only concerned with the charge against the Defendant. No one else is charged with theft. The Defendant is not charged with negligence, he is charged with theft. If from the evidence you find that the Defendant is not guilty, find him not guilty. If under the evidence you find that he is guilty, find him guilty in accordance with the evidence and the instructions. Now, that is all the Court can say." The third and fourth questions involved two evidentiary matters that were clarified by the court and counsel. The following exchange then ensued:

"THE COURT: What is your next question?

"FOREMAN RIPLEY: That is all I have here, Your Honor, unless some question has arisen in the minds of any of the jurors at this time.

"THE COURT: Now, Mr. Foreman, without indicating which way you stand, that is, for guilt or for innocence, without indicating which way you stand, tell the Court numerically how the jury stands on Count 1?

"FOREMAN RIPLEY: Last count was 10 for acquittal—

"THE COURT: No.

"FOREMAN RIPLEY: I beg your pardon. I misunderstood your question, sir.

"THE COURT: All right. Numerically how do they stand?

"FOREMAN RIPLEY: Shall I proceed with what I said? 10 for acquittal—

"THE COURT: No. Without indicating whether it is for guilt or for innocence, indicate numerically how the jury stood.

"FOREMAN RIPLEY: 10 to 2.

"THE COURT: How did the Jury stand on Count 2 numerically, without indicating which way?

"FOREMAN RIPLEY: Seven to five.

"THE COURT: Well, it just appears to the Court, Mr. Foreman, that this Jury has been confused. Some of the jurors are off on a tangent. Apparently they have misconceived the evidence, failed to understand the instructions or have not

been able to apply the instructions to the evidence. I feel that I should declare this a mistrial.

"The Court declares this case a mistrial. The Jury is discharged with the thanks of the Court."

On January 5, 1962, the court refused to entertain petitioner's plea of once in jeopardy and reset the case for trial.

The parties have stipulated that the bailiff reported to the judge "approximately two hours after the case had been submitted to the jury, that the foreman of the jury stated to the bailiff that the jury was 'hopelessly deadlocked,' and that this report was made to said judge at a time when the court was not in session and for that reason is not a part of the record in said action." The stipulation expressly states that petitioner did not waive his right to object to the admissibility of this report.

Prohibition is a proper remedy to prevent retrial when a defendant has been once in jeopardy. (*Cardenas* v. *Superior Court,* 56 Cal.2d 273, 275 [14 Cal.Rptr. 657, 363 P.2d 889]; *Gomez* v. *Superior Court,* 50 Cal.2d 640, 652 [328 P.2d 976]; *Jackson* v. *Superior Court,* 10 Cal.2d 350, 352 [74 P.2d 243, 113 A.L.R. 1422].)

"[J]eopardy attaches to a defendant when he is placed on trial before a court of competent jurisdiction upon a valid indictment or information before a jury duly impaneled and charged with his deliverance." (*Jackson* v. *Superior Court, supra.*) If a jury is discharged without returning a verdict, the defendant cannot again be put in jeopardy unless he consented to the discharge or legal necessity required it. (*Cardenas* v. *Superior Court, supra; People* v. *Valenti,* 49 Cal.2d 199, 209 [316 P.2d 633]; *People* v. *Webb,* 38 Cal. 467, 479-480.) The discharge of a jury contrary to law is equivalent to a verdict of acquittal. (*Jackson* v. *Superior Court, supra,* 10 Cal.2d at p. 356; *People* v. *Webb, supra,* 38 Cal. at p. 478.)

Since petitioner did not consent to the discharge of the jury, the sole issue is whether legal necessity required it. There is such necessity when "at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." (Pen. Code, § 1140; *People* v. *Smalling,* 94 Cal. 112, 115 [29 P. 421]; *People* v. *Cage,* 48 Cal. 323, 326 [17 Am.Rep. 436]; *Ex parte McLaughlin,* 41 Cal. 211, 216 [10 Am.Rep. 272].) The People contend that the trial judge was justified in concluding that there was no reasonable probability that the jury could agree

because of the bailiff's report that the jury was hopelessly deadlocked and because it was apparent from the exchange in open court between the judge and the foreman of the jury that the jurors were so confused as to the law and facts of the case that they would not be able to reach a verdict.

Although the determination whether there is a reasonable probability that the jury can agree rests in the sound discretion of the trial court, "[t]he power of the Court to discharge a jury without the consent of the prisoner is not an absolute, uncontrolled discretionary power. It must be exercised in accordance with established legal rules and a sound legal discretion in the application of such rules to the facts and circumstances of each particular case, and in this State is subject to review by an appellate Court." (*Ex parte McLaughlin, supra,* 41 Cal. at pp. 218-219.)

An extrajudicial report from the jury that it cannot agree on a verdict does not justify its discharge. Thus in *People* v. *Cage,* 48 Cal. 323, the court ordered the sheriff to go to the jury room and inquire if the jury had reached a verdict. The order was made in open court in the presence of the defendant's counsel. The sheriff reported the jury's answer that they "had not, and could not agree on a verdict." The trial judge then adjourned the court for the term one day before the term would have expired by operation of law. The adjournment operated as a discharge of the jury. In holding that a subsequent trial of the defendant for the same offense put him twice in jeopardy, the court stated, "It is evident that in a matter so gravely affecting the life or liberty of the accused, the discretion of the Court should be exercised upon some kind of evidence, and its judgment should be expressed in some form upon the record. In this case there was no evidence upon which the Court was authorized to act, and no apparent adjudication. . . . [The sheriff's report] was no evidence whatever upon which the Court could act." (48 Cal. at pp. 326-327.)

The judge in the present case had less justification for discharging the jury on the basis of the bailiff's report than did the judge in the *Cage* case. When the jury was discharged in *Cage,* they had deliberated for four days. They had returned to the courtroom once for instructions and had returned on the first and third days of deliberation to announce to the court their inability to agree on a verdict. On the second of these occasions the jury stated that they saw no chance for an agreement. During the fourth day of delib-

erations, when the judge ordered the sheriff to ask the jury if they had reached a verdict, the defendant's counsel was present and could have interposed an objection to this procedure and to the subsequent order adjourning the court for the term. In the present case, however, the jury was discharged after deliberating less than five hours. Although they returned to the courtroom to have four questions answered, they were given no opportunity to consider the judge's answers during further deliberations. No juror ever stated in open court that he thought the jury could not reach an agreement. Petitioner's counsel was not present when the bailiff reported to the judge the foreman's opinion that the jury was hopelessly deadlocked. Indeed, it appears from the record that petitioner's counsel did not learn of this extrajudicial communication until the judge alluded to it in refusing to entertain petitioner's plea of once in jeopardy 17 days after the jury was discharged. Such informal communications between court and jury are improper. (*People v. Alcalde,* 24 Cal.2d 177, 189 [148 P.2d 627]; *People v. Weatherford,* 27 Cal.2d 401, 418-419 [164 P.2d 753].) "[A]ll communications should be made in open court. . . . Ordinary procedure would require that the trial judge afford the parties an opportunity to be apprised of any such communication and to have the opportunity to make timely objection to any action by the court or jury which might be deemed irregular." (*People v. Alcalde, supra.*) Moreover, the judge in the *Cage* case discharged the jury immediately after the sheriff reported the jury's message. In the present case the judge discharged the jury three hours after the bailiff's report, during which time the jury continued to deliberate, evidently in the belief that they could reach a verdict. Whatever justification there may be for the judge's discharge of the jury must therefore be found in the exchange between him and the foreman of the jury.

 Ordinarily the trial judge should not discharge a jury on the ground that there is no reasonable probability that the jury can agree without questioning the jurors individually as to such probability. (*People v. Greene,* 100 Cal. 140, 141 [34 P. 630]; *People v. James,* 97 Cal. 400, 402 [32 P. 317]; *People v. Smalling,* 94 Cal. 112, 115 [29 P. 421]; *Ex parte McLaughlin,* 41 Cal. 211, 218 [10 Am.Rep. 272]; *People v. Sullivan,* 101 Cal.App.2d 322, 327 [225 P.2d 645]; *People v. Disperati,* 11 Cal.App. 469, 473 [105 P. 617].) "The statute does not provide just what proceeding shall be taken

to determine the probability of an agreement, but no better method occurs to us than to obtain from the jurors an expression of their judgment, and the court, in the exercise of the discretion committed to it, may give such weight to this opinion as the surrounding circumstances seem to demand." (*People* v. *Disperati, supra;* see also *People* v. *Greene, supra,* 100 Cal. at p. 142; *People* v. *Cage,* 48 Cal. 323, 327 [17 Am.Rep. 436].) This procedure was not followed here.

Although the judge need not state that he is discharging the jury because there is no reasonable probability that they can agree when it is apparent from the record that he discharged the jury for that reason (*People* v. *Greene, supra*), such probability is not apparent from the record in this case. After the jury entered the courtroom, the foreman stated that no verdict had been reached, but he gave no indication that he or any other juror considered further deliberations futile. His asking the judge to instruct on two points of law and to clarify two evidentiary matters strongly suggests that the jurors felt they could reach a verdict if these legal and factual questions could be resolved. The short answer to the People's contention that the four questions related to simple matters of law and evidence and indicated that the jury was so confused that they could not be expected to reach a verdict is that the simple questions received simple, clear, and forthright answers that presumably cleared up any confusion the jury may have had. Even if the judge was of the opinion that they were still confused, it cannot be assumed from their questions or anything else in the record that the law and the evidence were so far beyond their understanding that further instructions would have been futile.

There is no merit in the People's contention that it was necessary to discharge the jury because the ends of justice would otherwise be defeated. *Gori* v. *United States,* 367 U.S. 364 [81 S.Ct. 1523, 6 L.Ed.2d 901], on which the People rely, held that there was no violation of the Fifth Amendment's prohibition against double jeopardy when the trial judge declared the first trial a mistrial without the defendant's consent since he "was acting according to his convictions in protecting the rights of the accused," and "in the sole interest of the defendant." (367 U.S. at pp. 366, 369.) Clearly no such motive prompted the trial judge's action in this case, for he knew that the jury stood ten for acquittal and two for conviction on Count 1. Moreover, we pointed out in *Cardenas* v. *Superior Court,* 56 Cal.2d 273, 275-276 [14 Cal.Rptr. 657,

363 P.2d 889], that the *Gori* holding is not in accord with California law.

Once the jury is impaneled and sworn, the defendant is in jeopardy. He cannot be deprived of any benefit to be derived from that jeopardy and is entitled to have the jury render a verdict, when, as in this case, he has not consented to the discharge of the jury and there is no legal necessity for such discharge. (*People* v. *Ny Sam Chung,* 94 Cal. 304, 307 [29 P. 642, 28 Am.St.Rep. 29] ; *People* v. *Hunckeler,* 48 Cal. 331, 334.)

Let the peremptory writ of prohibition issue as prayed.

Gibson, C.J., Peters, J., White, J., and Dooling, J., concurred.

McCOMB, J.—I dissent.

On December 18 and 19, 1961, petitioner was tried by a jury on two counts of grand theft. The jury retired at 4 :12 p.m. on December 19 and returned to the courtroom at 9 :05 p.m. When the court asked if the jury had arrived at a verdict, the foreman replied : "Your Honor, we have not reached a verdict. We have some questions that we would like to ask and advice from the Court if we may ?"

The first question, relating to count 1, was whether a charge of theft is nullified if the victim agreed to accept weekly payments as restitution. The court reread an instruction that restitution is not a defense.

The second question, relating to count 2, was, "Would negligence in the care of the funds, whereby another person may have stolen the money still leave the Defendant responsible and guilty of theft ?" The court answered : "Well, Mr. Foreman, we are here only concerned with the charge against the Defendant. No one else is charged with theft. The Defendant is not charged with negligence, he is charged with theft. If from the evidence you find that the Defendant is not guilty, find him not guilty. If under the evidence you find that he is guilty, find him guilty in accordance with the evidence and the instructions. Now, that is all the Court can say."

The court, of course, had previously advised the jury that if there was any reasonable doubt as to the guilt of the defendant, he was entitled to a verdict of not guilty. The information had also been read to the jury and the essential elements of the offense explained to them.

The third and fourth questions involved two evidentiary matters that were clarified by the court and counsel. The following exchange then ensued: "THE COURT: What is your next question? FOREMAN RIPLEY: That is all I have here, Your Honor, unless some question has arisen in the minds of any of the jurors at this time. THE COURT: Now, Mr. Foreman, without indicating which way you stand, that is, for guilt or for innocence, without indicating which way you stand, tell the Court numerically how the jury stands on Count 1? FOREMAN RIPLEY: Last count was 10 for acquittal— THE COURT: No. FOREMAN RIPLEY: I beg your pardon. I misunderstood your question, sir. THE COURT: All right. Numerically how do they stand? FOREMAN RIPLEY: Shall I proceed with what I said? 10 for acquittal— THE COURT: No. Without indicating whether it is for guilt or for innocence, indicate numerically how the jury stood? FOREMAN RIPLEY: 10 to 2. THE COURT: How did the Jury stand on Count 2 numerically, without indicating which way? FOREMAN RIPLEY: Seven to five. THE COURT: Well, it just appears to the Court, Mr. Foreman, that this Jury has been confused. Some of the jurors are off on a tangent. Apparently they have misconceived the evidence, failed to understand the instructions or have not been able to apply the instructions to the evidence. I feel that I should declare this a mistrial. The Court declares this case a mistrial. The Jury is discharged with the thanks of the Court."

The question here presented is whether the trial judge was justified under section 1140 of the Penal Code in discharging the jury. I believe he was.

Section 1140 of the Penal Code provides: "Except as provided by law, the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, unless by consent of both parties, entered upon the minutes, *or unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree.*" (Italics added.)

Whether there is a reasonable probability that the jury can agree rests in the sound discretion of the trial court. The power of the court to discharge a jury without the consent of the prisoner is not absolute; it must be exercised in accordance with established legal rules and a sound legal discretion in the application of such rules to the facts and circumstances

of each particular case. (*Ex parte McLaughlin,* 41 Cal. 211, 218 et seq. [10 Am.Rep. 272].)

In the instant case the trial judge questioned the foreman in the presence of all parties as to how the jury stood numerically on reaching a verdict. After receiving this information and having fully instructed the jury as to the elements of the offense charged and having observed the jurors for two days and listened to the questions of the foreman and his answers to the judge's questions relative to the standing of the jury, the trial judge was justified in finding that the jury was unable to agree and therefore, under the provisions of section 1140 of the Penal Code, in coming to the conclusion that there was no reasonable probability that the jury could agree and was correct in his ruling discharging them.

This conclusion is supported by the rule in this state that on appeal all conflicts in the evidence must be resolved in favor of the respondent and all legitimate and reasonable inferences indulged to uphold the findings of the trial court if possible. Where the findings are attacked for insufficiency of the evidence, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence to support them. (*Estate of Bristol,* 23 Cal.2d 221, 223 [2] [143 P.2d 689].)

In *Estate of Bristol* this court said, at page 223 [3] : "It is common knowledge among judges and lawyers that many cases are determined to the entire satisfaction of trial judges or juries, on their factual issues, by evidence which is overwhelming in its persuasiveness but which may appear relatively unsubstantial—if it can be reflected at all—in a phonographic record. Appellate courts, therefore, if there be any reasonable doubt as to the sufficiency of the evidence to sustain a finding, should resolve that doubt in favor of the finding; and in searching the record and exploring the inferences which may arise from what is found there, to discover whether such doubt or conflict exists, the court should be realistic and practical." Upon such a view of the law, the finding of the trial court in the present case should be sustained.

The factual situation presented to the jury in the case at bar was not complicated. The owner of a restaurant at Lake Tahoe had engaged petitioner and his wife to manage the restaurant. The terms were $100 per week and either one-half or one-third of the net profits. Petitioner was to receive $75 per week and his wife $25. They were also to have lodging and certain meals at the restaurant. The owner stayed with

petitioner for several days to show him the procedure for bookkeeping and procured for him deposit bags for the money which was to be left each evening in the bank's night depository. The owner came up to Lake Tahoe once a week and paid the employees and took back with him the tapes from the cash register and tickets in order to set up his own ledger and have his accountant post the figures.

This arrangement began about August 12 or 13. August 29 when the owner arrived at Lake Tahoe he found that petitioner had not made any deposits for the period August 21 through August 27. He had a conversation with petitioner, in which petitioner admitted that he had used this money to pay off his own pressing bad checks and promised to repay the money at $50 per week. The owner agreed, since petitioner had already taken the money.

On September 11 the owner was advised by another employee that petitioner had left the premises and taken all of his belongings with him. The owner then came up to Lake Tahoe and found that although the receipts and register tapes were left in the restaurant, no money had been deposited in the bank account for September 8, 9, or 10, nor was the $150 present which had been kept in the register for change. He also found that the special deposit bags he had given petitioner to use had been in the bank since the last deposit on September 7.

· The net amount taken for the period August 22 through August 27 was approximately $642.33, and the amount taken for the period September 8 through September 11 was $411.92. Petitioner made no demand for his last pay check or for an accounting and left no forwarding address. The net profit for the period that petitioner operated the restaurant was approximately $130.

Petitioner's defense was that as to the first count relating to the money taken during the period August 21 through August 27, he had this money undeposited when he spoke to the owner, and asked to borrow it, and the owner agreed that he could borrow it and repay it at $50 per week; that they had no discussion of any interest; and that he used it to pick up his outstanding bad checks, which he immediately destroyed.

As to the second count, petitioner alleged that he had each day's deposit in a money bag, which he at first put in his car when he was thinking about leaving the employ of the owner, and then just before he left, he placed these money bags in

the box in the restaurant with the register tapes and left them there with a note to the owner that he was leaving and would write him after he was settled.

A further defense was petitioner's alleged ill health from his high fever, which, according to the testimony of his expert, resulted in his suffering from an intoxication due to endogenous intoxicants. This resulted, according to the expert's testimony, in a clouding of petitioner's consciousness.

With this statement of the evidence in mind, it appears that the questions asked by the foreman of the jury patently displayed the jury's misconception of the charge of theft.

The first question was as to whether the agreement to accept weekly payments by the victim would nullify a possible charge of theft and change it to the "status of a contract to pay on installments."

The question with relation to the second count was whether negligence in the care of funds by petitioner whereby another person stole the money would leave him responsible for the theft.

A subsequent question related to the whereabouts of the keys to the bags. The record contained no testimony in this regard.

Thereafter the jury was questioned as to their numerical division on each count. It was 10-2 on the first count and 7-5 on the second. It was at this point that the court declared a mistrial.

It is apparent that if the jury believed petitioner and his testimony, he would not have had a fraudulent intent. However, they apparently did not believe this, or at least some of them did not comprehend the instructions of the court that restitution is not a defense.

The trial judge viewed the individuals comprising the jury and was familiar with their demeanor and at least to some extent with their individual propensities. From the questions propounded to him he apparently concluded that they could not reach an agreement on any count, inasmuch as some of them obviously had not comprehended the evidence, the instructions of the court, or the elements of the charges which were before them. Under those circumstances it was not unreasonable for the judge to conclude that it was unlikely that all of the jurors could ever agree on a verdict. Hence the discharge of the jury by the court could not be said to be an abuse of discretion. (*People* v. *Sullivan,* 101 Cal.App.2d 322, 328 et seq. [225 P.2d 645].)

The time that a jury should be held for deliberation is within the trial court's discretion. (*People* v. *Casserio,* 16 Cal. App.2d 223, 228 [4] [60 P.2d 505]; *People* v. *Wooley,* 15 Cal.App.2d 669, 673 [2] [59 P.2d 1065].)

The result which I have reached is supported by the Supreme Court of the United States in its holding in *National Labor Relations Board* v. *Walton Manufacturing Co.,* 369 U.S. 404 [82 S.Ct. 853, 855, 7 L.Ed.2d 829], where the court said: "But the Examiner—the one whose appraisal of the testimony was discredited by the Court of Appeals in *Florida Citrus Canners Cooperative* case—sees the witnesses and hears them testify, while the Board and the reviewing court look only at cold records. As we said in the *Universal Camera* case [340 U.S. 474 (71 S.Ct. 456, 95 L.Ed. 456)] : '. . . The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case.' 340 U.S., at 496, 71 S.Ct. at 469. For the demeanor of a witness '. . . may satisfy the tribunal, not only that the witness' testimony is not true, but that the truth is the opposite of his story; for the denial of one, who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies.' *Dyer* v. *MacDougall,* 201 F.2d 265, 269."

The peremptory writ of prohibition, in my opinion, should be denied.

Schauer, J., concurred.