Tyrone MARTIN, Appellant,

v.

UNITED STATES, Appellee.

Nos. 89–885, 89–1523.

District of Columbia Court of Appeals.

Argued May 7, 1991.
Decided Dec. 30, 1991.
Rehearing and Rehearing En Banc
Denied May 8, 1992.

Robert L. Wilkins, Public Defender Service, with whom James Klein and Elizabeth G. Taylor, Public Defender Service, were on the brief, for appellant.

James N. Plamondon, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Roy W. McLeese, III, and Steven J. Roman, Asst. U.S. Attys., were on the brief, for appellee.

Before SCHWELB and WAGNER, Associate Judges, and PRYOR, Senior Judge.

SCHWELB, Associate Judge:

Life can be cheap on the streets of our city. On the evening of March 26, 1988, Stephen Brandon jumped out of the back seat of an automobile which was being driven on Wheeler Road in southeast Washington by appellant Tyrone Martin and fired a handgun at Clayton (Ricky) Gray and Marvin Pegues. Gray was struck in the chest and died shortly afterwards; Pegues escaped unharmed.

Brandon and Martin were charged with the crimes. The prosecution's theory was that Brandon, who was twenty-one years old, was the principal, and that Martin, who was forty-one, and who was related to Brandon by marriage, induced Brandon to act and was therefore responsible as an aider or abettor. Brandon entered a mid-trial guilty plea to two lesser-included offenses; Martin was convicted of the principal charges by the jury.[1]

At trial, evidence was proffered or received with respect to two possible (and strikingly different) motivations for the carnage on Wheeler Road. According to the prosecution, Brandon killed Gray and shot at Pegues at Martin's urging as a result of an obscene verbal altercation, marginally over a woman, in which Martin had become embroiled with the two victims in a liquor store a short time earlier. Martin's theory, based primarily on Brandon's testimony during the plea proceeding, was that Gray and Pegues had robbed Brandon on an earlier occasion, and that Brandon's

---

1. The specific offenses alleged in the indictment were first degree murder while armed, D.C.Code §§ 22–2401, –3202 (1989), assault with intent to kill while armed, *id.* §§ 22–501, –3202; and carrying a pistol without a license (CPWOL), *id.* § 22–3204. Martin was acquitted of CPWOL but convicted of the remaining charges. Brandon's plea was to the lesser included offenses of second degree murder while armed, *id.* § 22–2403, –3202, and assault with a dangerous weapon, *id.* § 22–502.

motive was personal revenge. Martin sought to show that it was Brandon, not Martin, who quarreled with the men at the liquor store. He contended, and continues to maintain on appeal, that a robbery victim's revenge provides a far more plausible motive for murder than does the salvaging of a friend's pride following an exchange of tasteless insults.

Beginning with a pretrial motion for severance, Martin consistently but unsuccessfully asked that the cases be tried separately and that Brandon be tried first, so that he (Martin) could present to the jury Brandon's testimony, which he claimed would tend to exculpate him. After Brandon entered his plea, Martin requested a mistrial so that he could call Brandon as a defense witness after Brandon had been sentenced. The judge denied the motion.

As a result of the judge's ruling, the jury never learned that Brandon claimed to have a cogent personal reason, which was completely unrelated to Martin, for seeking revenge against Gray and Pegues. Concluding that the judge's refusal to order a mistrial unreasonably restricted Martin's opportunity to present significant and potentially exculpatory testimony, that this consideration outweighed the public interest in short-term judicial economy, and that the judge erroneously relied on his own assessment of Brandon's credibility, we reverse Martin's convictions and remand the case for a new trial.

## I

### THE EVIDENCE

*A. The prosecution case.*

The principal prosecution witness at trial was Vilencia Stover, who was with Martin and Brandon both during the altercation at the liquor store and immediately preceding the homicide. Her testimony was corrobo-

rated, in part, by Marvin Pegues, the second victim of the shooting, and by Janice Easterwood, a young woman who was with Martin, Brandon and Ms. Stover for a part of the relevant time.

When the case came to trial in March 1989, Ms. Stover, who is known to her friends as Lindsey, was a twenty-five year old mother of three. She testified that she "used to have a love affair" with Gray, whom she liked "quite a bit," and that she had spent the evening before the murder with Gray.[2] She explained that she was also slightly acquainted with Martin, whom she knew as "Petey," and who was considerably older than she was. She claimed that "Petey" would try to flirt with her on occasion,[3] but that his romantic aspirations towards her were unreciprocated and had not been consummated.

On March 26, 1988, Ms. Stover had been visiting one of her girlfriends in the Trenton Park apartment complex in southeast Washington. The two women had been smoking crack cocaine from a pipe. Explaining that "when I hit [cocaine], I like to drink," Ms. Stover decided to go out and get a beer. In the parking lot, she encountered Martin and asked him for a ride to the liquor store. Martin agreed to take her. On the way to the store, Martin and Ms. Stover picked up Brandon (whom Ms. Stover knew as "Black"), as well as a female acquaintance named Janice Easterwood.

When the four of them arrived at the liquor store, Brandon went to a telephone booth to make a call, while the other three went inside. Ms. Stover asked Martin to buy her a six-pack of beer. Martin declined to do so and made a belittling remark about Ms. Stover and her friends. He did, however, agree to buy Ms. Stover a sausage. In the meantime, Gray and Pegues had come into the establishment. Ms.

---

**2.** Gray was a married man. Ms. Stover testified that some hours after his death, his widow, apparently believing that Ms. Stover had arranged the murder or was in some way responsible for it, armed herself and came looking for Ms. Stover.

**3.** According to Ms. Stover, Martin "used to try and crack on me, you know, call me black girl, give me compliments about myself." She said "crack on me" meant "throwing passes, you know, like 'you nice looking girl, you fat' ... he want me and stuff." According to Martin, on the other hand, Ms. Stover had on several occasions provided him with sex for money.

Stover testified that Martin was standing in line behind her and that Gray was positioned behind Martin. Gray playfully tapped Ms. Stover and began "ducking and hiding behind Petey's (*i.e.* Martin's) back." Martin became annoyed and demanded to know why Gray was playing behind his back. Gray responded that he was playing behind Ms. Stover's back, not behind Martin's. Martin asked Ms. Stover if she knew Gray, and she confirmed that she did. An argument ensued, prompting Ms. Stover to go outside the store and to bring Brandon to the scene.

Gray, apparently attempting to put an end to the incident, told Martin that he was sorry, that "it ain't like you think it is," and that he was simply trying to "holler" at Ms. Stover because he knew her. Peace might perhaps have been restored by Gray's apology, but at this time Pegues intervened. According to Ms. Stover, Pegues told Gray:

> Man, you don't owe that man no explanation. Fuck that man. He could suck my dick.

Now even angrier, Martin responded that "you going to suck your own dick, because don't nobody tell me to suck their dick." The encounter nevertheless ended without any blows being struck, for all of the participants left the store.

Martin, Ms. Stover, Brandon and Ms. Easterwood drove back to Trenton Park. According to Ms. Stover, Martin was still extremely angry over the incident at the liquor store. When the group arrived at the apartment complex, Ms. Easterwood left. Martin remained in the vicinity of the car but told Brandon to "get the things," or words to that effect. Brandon departed, but returned soon thereafter with two handguns. Paul Simms, a friend of Martin and Brandon, arrived with Brandon. Ms. Stover, apparently apprehensive about the

weaponry, attempted to depart. Martin gave her a "serious look," however, and told her that she wasn't going anywhere, because she was going to see him[4] "suck his own dick."

Ms. Stover, Martin, Brandon, and Simms drove off in the direction of the liquor store. Once again, Tyrone Martin was at the wheel. As Martin was driving along Wheeler Road, someone yelled "there they go!" Ms. Stover and the others recognized Gray and Pegues, who were travelling on foot. Martin turned the car around and stopped near the two men. Brandon got out of the vehicle and yelled at them. Gray put up his hands, but Brandon shot him in the chest.[5] Brandon also fired at Pegues; fortunately he missed. Pegues made his escape as Gray lay on the sidewalk, mortally wounded.

Brandon returned to the car. According to Ms. Stover, Martin complained that "you got the wrong guy" and that he, Martin, was supposed to (or going to) "get one too." No further acts of violence were attempted, however, and Martin drove to Simms' apartment. According to Ms. Stover, Brandon threatened in Martin's presence that if Ms. Stover reported the crime, then "the same thing that happened to [Gray] would happen to [her]." Eventually, the three men departed, leaving Ms. Stover behind.[6]

On cross-examination, Ms. Stover acknowledged that she had given two signed statements to the police. She testified that initially "I wasn't giving [the police] the true story for I didn't like how [the detective] was talking to me[7] and I was afraid to tell him." In the first statement, she described Martin as twenty-three or twenty-four years of age; any other claimed discrepancies between her statements and trial testimony, however, were in our view,

---

4. Presumably Pegues or Gray, not Martin.

5. The shooting was witnessed by a disinterested but horrified onlooker, Olivia Smallwood, who described it for the jury.

6. Other prosecution testimony revealed that at about 1:30 a.m. on the following morning, the men's car with Simms at the wheel, was stopped

on the New Jersey Turnpike for erratic driving. Martin was passed out in the back seat of the car; he had liquor on his breath.

7. According to Ms. Stover, the detective "disrespect me and told me that he will lock me up if I didn't tell him." She also claimed that he called her a "bitch" and that he threatened her.

of a comparatively minor character, although the defense attempted to make much of Ms. Stover's failure originally to mention that Paul Simms was in the car during the ride that preceded the fatal shooting.

Pegues also testified for the prosecution. He stated that he and Gray went to the liquor store on the night in question in order to obtain change, so that they could purchase a ten dollar bag of "boat" (PCP or marijuana) for eight dollars. They saw Ms. Stover, whom they knew as Lindsey, with a man with whom Pegues was not previously acquainted, but whom he identified in court as Martin. Gray attempted to speak to Ms. Stover, but Martin became angry and demanded to know what Gray was doing behind his back. Pegues' description of the encounter was reasonably similar to that provided by Ms. Stover, except that Pegues did not mention the profane language which dominated Ms. Stover's account, and claimed not to recollect having made a remark of the kind that had allegedly so angered Martin. Pegues stated that he and Gray both became angry, but that "I wasn't angry like I wanted to fight." Pegues said he told Martin that he was "acting like he was two years old," and that "it isn't even worth it." In response, according to Pegues, Martin "said he would kill both of us."

Pegues also described the shooting of his friend, but was unable to identify the gunman, except to state that it was someone other than Martin. He related that he ran for his life, but that after the car carrying the killer drove off, he returned to the scene, saw his bleeding companion lying on the sidewalk, and called for help.

Janice Easterwood, a young woman who was friendly both with Brandon and with Ms. Stover, testified that she came into the liquor store with Ms. Stover and Martin, and that she gave Ms. Stover a dollar to buy a beer after Martin refused to buy one

for her friend. She stated, however, that she then went back to Martin's car and was no longer in the store during the argument which Martin allegedly had with Gray and Pegues. When Martin and Ms. Stover returned to the car, Martin was extremely agitated, his complaint being that a "motherfucker" had told him to "suck his dick." Ms. Easterwood also testified that when the group arrived at Trenton Park, Martin asked Brandon to "get it." She had previously seen handguns in the apartment which Martin sometimes shared with Brandon. She left, however, before Brandon returned.

### B. The defense case.

Martin was the principal witness in his own defense.[8] He testified that he had been married for nineteen years and had four children. He lived in New York, but was in the process of relocating his family to Silver Spring, Maryland. In the meantime, he was staying at the Trenton Park complex. Brandon, who, as we have noted, was half his age at twenty-one and related to him by marriage, sometimes shared the apartment with him.

On the evening of March 26, 1988, Martin was planning to drive to New York with Brandon and Paul Simms. He acknowledged that he was a drinking man, and it was his intention to purchase some liquor before departing. On the way, he encountered Ms. Stover, whom he knew as "Lindsey," and with whom he said he had "tricked" (i.e., he had paid her money for sex) on three or four occasions.[9] Ms. Stover got in the car and, after they picked up Brandon and Ms. Easterwood, they proceeded to the liquor store.

Upon arrival at their destination, Martin went into the store and bought four bottles of liquor. He declined Ms. Stover's request that he buy her a beer; Ms. Easterwood, using insulting language about Mar-

---

8. Lilian Bradshaw, a friend of Ms. Stover, testified that several of the individuals in the case knew each other, and specifically that Ms. Stover knew Pegues. Martin also presented expert testimony regarding the effects of PCP and cocaine on the user's mental processes.

9. On cross-examination, Martin stated that he last had sex with Ms. Stover on the day of the incident. Exactly when on that day this is supposed to have occurred is unclear from the record.

tin, told Ms. Stover that she would buy her a beer instead. As this was going on, a man whom he did not know (obviously Gray) began to "play" with Ms. Stover, reaching over behind Martin. Martin was irritated, and told the man he should step in front of him if he wanted to play with the woman. Martin denied that there was any argument between him and Gray or any discussion with anybody [10] about "sucking" anyone's "dick." He testified, however, that he observed a conversation or argument in another part of the store in which Gray, Brandon, Ms. Stover and Ms. Easterwood participated. He told Brandon to "leave that alone," and returned to the car.

Martin testified that he drove the group back to Trenton Park, and that there was no discussion en route of any incident at the liquor store. When they arrived, Ms. Easterwood left, and Brandon got out of the car to pick up his clothes for the trip to New York.[11] Brandon then returned to the car with Simms; each man was carrying an overnight bag.[12] Ms. Stover announced that she was going to New York with the three men. When Martin questioned Ms. Stover's plan to travel with them, she said that she was going to stay with Simms and, when Simms did not react, Martin drove off towards New York, with all three of the other individuals as passengers. Martin explained that he had never driven to New York from Trenton Park before, and was therefore relying on Simms and Ms. Stover for directions.

Martin testified that after he had turned on to Wheeler Road, Ms. Stover said "stop," and "there they go." Someone told him to make a U-turn, which he did. Suddenly, Brandon and Simms got out of the

car, and shortly thereafter he heard shots. The two men returned to the vehicle and told Martin to drive to Simms' apartment. Martin did so, and he and the others stayed at that apartment for an hour or so, drinking. The three men then drove to New York; Ms. Stover remained behind.

In relation to the shooting, Martin testified that he "looked straight ahead" when he heard the gunfire. He claimed that he did not see Gray or Pegues at the time, nor did he subsequently notice Gray's body on the sidewalk. Martin indicated that he may have asked Brandon and Simms "what was up," but that he posed few if any additional questions to them. As Martin meaningfully put it, "some things you don't ask, you don't want to know." On cross-examination, the prosecutor attempted, apparently with some success in light of the jury's verdict, to cast doubt on Martin's claim that he had seen and heard so little.[13]

### C. Brandon's plea.

Following the conclusion of the prosecution case, Martin's codefendant, Stephen Brandon, entered a plea of guilty to second-degree murder while armed and assault with a dangerous weapon. When questioned by the trial judge as to the underlying facts, Brandon, who had been placed under oath, stated that

> Martin Pegues and Clayton, Ricky Gray, they robbed me. And I seen them in the liquor store, and I approached this young lady named Vilencia, who set me up. And, you know, she laughed, and that is when I ran out of the store, and I shot him.

Elaborating slightly as to the time and location of the incident,[14] Brandon stated that he and Paul Simms, Tyrone Martin,

---

**10.** Martin testified that he did not notice anybody with Gray in the store. He said that he did see Gray with another man, presumably Pegues, outside the establishment.

**11.** Martin claimed that he had previously packed his own bags.

**12.** Martin denied that he saw weapons of any kind, and stated that there had never been any firearms in the apartment.

**13.** Martin was impeached with a 1984 conviction for introducing contraband into a prison and a 1974 conviction for burglary. He had used two different aliases in the two cases.

**14.** Brandon's answers to the judge's questions are somewhat confusing, but he initially indicated that he shot Gray "right there" (at or outside the store) and that "I don't remember nothing about no car." As reflected in the text below, however, Brandon soon retreated from this astonishing version.

Ms. Stover got into the car, and that Ms. Stover told Martin, who was driving, to stop. Ms. Stover "pointed the guys out, and that is when [Martin] stopped the car, and that is when I jumped out and shot him." He repeated that he did so because the men had robbed him. He said he also shot at Pegues, but that he missed because of "bad aiming."

Responding to a question from the judge as to whether self-defense was involved, Brandon at first stated "yes, there really was." After consulting with his attorney, however, Brandon explained that Pegues and Gray had robbed him, but that this had occurred earlier, and that he was not in danger from them at the time of the shooting. The colloquy ended as follows:

Q. Well, then, why did you kill one of them?

A. Because they looked exactly like the persons who robbed me.

Q. That is what I mean; you saw them in the liquor store and decided that they looked like the people who robbed you, so you decided to kill them?

A. Yes sir.

Brandon's attorney declined to allow her client to provide any information beyond that required to show that there was a factual basis for the plea. In response to a question about the origin of the murder weapon, counsel represented that "if the government is seeking to have my client say that in some way or another he obtained it from Mr. Martin, that is not going to be the case because it simply isn't the case."

## II

### THE MOTION FOR A MISTRIAL

*A. The motion.*

Following his indictment, Martin filed a motion, supplemented on the eve of trial, for a severance of defendants. He alleged that Brandon had made a written statement to the police "exculpating" Martin.[15] Citing uncertainty as to whether Brandon would testify at a joint trial, Martin requested that Brandon be tried first so that he would be available to testify on Martin's behalf at Martin's separate trial.

The judge denied the motion, and Brandon and Martin went to trial together. As the trial progressed, Martin's attorney repeatedly returned to the issue of severance as various new circumstances developed, her efforts sometimes precipitating rebukes from the trial judge for allegedly wasting time on matters which had previously been decided.

During the course of the proceedings relating to Brandon's midtrial guilty plea, Brandon's attorney stated that her client would continue to invoke his privilege against self-incrimination until after he had been sentenced,[16] and would refuse to answer any questions which he did not have to answer in order to provide a factual basis for the plea. Contending that Brandon's testimony was essential to her client's defense, counsel for Martin asked the judge to declare a mistrial so that Martin could be tried anew after Brandon had been sentenced. The judge stated that he had already invested more than two weeks in the case. Noting that Martin's counsel had represented that her office had obtained several inconsistent signed statements from Brandon regarding what had occurred, the judge stated that if this was so, then [Brandon] "would have been a most undependable witness and not anything that could or should be relied upon." For these reasons, in the judge's view, the interests of justice required that the trial

15. In that statement, Brandon claimed that he shot Gray in self-defense. He asserted that when he came to the liquor store, he realized that he had been set up by "that bitch" (alluding to Ms. Stover), apparently when he saw her talking to Gray and Pegues. He said he told Martin about having been set up, but Martin did not believe him and "left it alone." When Brandon confronted Ms. Stover, she laughed at him, and one of the men told him to "get the fuck out of the store." An argument and chase ensued, one of the men pulled a pistol, there was a struggle for the weapon, and Gray was shot.

16. A defendant who has entered a plea of guilty continues to enjoy the protections of the Fifth Amendment privilege until he has been sentenced. *Tucker v. United States*, 571 A.2d 797, 799 (D.C.1990).

proceed to verdict. Accordingly, the motion for mistrial was denied.

### B. General considerations

■ The right to call witnesses in one's own behalf is basic to our system of jurisprudence. *Chambers v. Mississippi,* 410 U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973). "[It] is a fundamental element of due process of law." *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967); *see King v. United States,* 550 A.2d 348, 353 (D.C. 1988). In the absence of the most compelling considerations, a defendant should not be required to go to trial without being able to present the testimony of a witness who might exculpate him. *See King, supra,* 550 A.2d at 353. Accordingly, although the right to call witnesses is not an absolute one—it is trumped, for example, by a witness' valid invocation of the privilege against self-incrimination [17]—the fundamental character of that right is a major factor to be considered in the balancing process. *Id.* "[A]ny interest which the state may have in restricting who may be called as a witness is subject to close scrutiny...." *Id.*

■ Subject to these considerations, we have repeatedly held, in cases in which defendants have sought to present the testimony of their codefendants, that the grant or denial of a continuance,[18] *Tucker, supra* note 16, 571 A.2d at 800, or of a severance, *King, supra,* 550 A.2d at 352, is a matter resting in the sound discretion of the trial judge. A conclusory assertion that a severance or, as here, a mistrial, is necessary to enable one defendant to present the exculpatory testimony of the other is insufficient. *Lumpkin v. United States,* 586 A.2d 701, 707 (D.C.), *cert. denied sub nom. Austin v. United States,* — U.S. ——, 112 S.Ct. 151, 116 L.Ed.2d 116 (1991).

In determining whether a defendant who proposes to call a codefendant as a witness is entitled to a severance, the court should consider

> the exculpatory nature of the desired testimony, the desire of the movant to present this testimony, the willingness of the codefendant to testify, and the demands of effective judicial administration.

*Jackson v. United States,* 329 A.2d 782, 788 (D.C.1974), *cert. denied,* 423 U.S. 851, 96 S.Ct. 95, 46 L.Ed.2d 74 (1975); *see also Lumpkin, supra,* 586 A.2d at 707; *King, supra,* 550 A.2d at 352. "The burden is on the moving party to satisfy the court that the testimony would be exculpatory in effect and that the codefendant is, in fact, likely to testify." *King, supra,* 550 A.2d at 352.

■ In the present case, the question of a severance became moot upon the entry of Brandon's plea. Both parties apparently assume, however, and we agree, that the *Jackson* factors apply with equal force where the precise issue is whether the ongoing trial should be terminated, and whether a mistrial should be declared, so that Martin could call Brandon as a witness after the latter had been sentenced. We therefore turn to a consideration of each of these factors.

### C. The exculpatory nature of the desired testimony.

■ Without Brandon's testimony, the only motive provided to the jury for the murder of Gray, and for the firing of shots at Pegues, was revenge for an alleged insult to Martin. If that was in fact Brandon's motive, then an impartial trier of fact could reasonably find that the likelihood that Martin played a role in the crimes

---

17. *See, e.g. Kastigar v. United States,* 406 U.S. 441, 444–45, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972); *Wilson v. United States,* 558 A.2d 1135, 1140 (D.C.1989). In the present case, Martin sought to call Paul Simms as a defense witness; Simms invoked the privilege, and the judge sustained the claim. On appeal, Martin does not challenge that ruling.

18. In the present case, the issue was presented in he context of a motion for a mistrial. Such motions are likewise committed to the trial court's broad discretion. *Lee v. United States,* 562 A.2d 1202, 1204 (D.C.1989).

would be substantially greater than if the motive had been one which did not concern Martin. Under the scenario proffered by the prosecution, it was the real or perceived injury to *Martin's* feelings that was being redressed, and Martin had a reason, however inadequate that reason may appear to reasonable persons,[19] to command or otherwise participate in the commission of the crimes. If Brandon killed Gray because Gray and Pegues insulted Martin, then a jury might reasonably find it improbable that he acted independently of Martin, an older relative who had apparently felt that his manhood had been challenged.

If, on the other hand, Brandon shot at the two men, and killed one of them, because they had previously robbed *him*, this would be none of Martin's affair. His interests and pride would not be implicated. It would be difficult indeed to conjure up a plausible motive for Martin to play any role in the matter under a scenario in which Gray and Pegues had offended Brandon but not Martin.

■ Evidence of a lack of motive is quintessentially exculpatory. "Motive is evidence of the commission of any crime." *United States v. Bradshaw*, 690 F.2d 704, 708 (9th Cir.1982), *cert. denied*, 463 U.S. 1210, 103 S.Ct. 3543, 77 L.Ed.2d 1392 (1983); *see generally* 2 JOHN HENRY WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 389, at 417 (James H. Chadbourn rev. ed. 1979) (emphasis omitted). But evidence about motive is a two-way street. "[T]he absence of motive tends to support the presumption of innocence; it is a fact to be reckoned [with] on the side of innocence." *People v. Weatherford*, 27 Cal.2d 401, 423, 164 P.2d 753, 765 (1945) (en banc) (citations and internal quotation marks omitted). As

the court explained in *Pollard v. State*, 218 Ind. 56, 60, 29 N.E.2d 956, 957 (1940),

> [t]he absence of a motive for committing the crime charged is in the nature of an exculpatory circumstance which a defendant on trial is entitled to establish.... To exclude such proof would place an arbitrary limitation on the accused that would be unjust, in view of the freedom allowed the prosecution in adducing facts and circumstances pointing to his guilt.

*See also Roundtree v. United States*, 581 A.2d 315, 342–43 (D.C.1990) (concurring and dissenting opinion), and authorities there cited.

■ The government correctly notes that Brandon's statement at his plea was not conclusively exculpatory as to Martin. Indeed, it placed Martin in the car at the murder scene. Moreover, it is by no means certain that Martin would have been acquitted if Brandon had testified. That, however, is not dispositive.[20] As Judge Cardozo observed for the court in *Lewis v. Ocean Accident & Guar. Corp.*, 224 N.Y. 18, 22, 120 N.E. 56, 57 (1918), "the law contents itself with probabilities, and declines to wait for certainty before drawing its conclusions." Ordinarily, any evidence which is logically probative of some fact in issue is admissible, *Ahrens v. Broyhill*, 117 A.2d 452, 455–56 (D.C.1955), unless it conflicts with some settled exclusionary rule. *Fowel v. Wood*, 62 A.2d 636, 637 (D.C.1948). "[I]f the evidence offered conduces in any reasonable degree to establish the probability or improbability of the fact in controversy, it should go to the jury." *Home Ins. Co. v. Weide*, 78 U.S. (11 Wall.) 438, 440, 20 L.Ed. 197 (1870).

> It is enough if the item could reasonably show that a fact is slightly more probable than it would appear without that evidence. Even after the probative force

---

**19.** Even the prosecutor, in argument to the court, Tr. VI at 421, and to the jury, *id.* at 518, described the motivation as "so slight." The trial judge thought it "bizarre that Mr. Brandon would jump out of the car and fire the weapons at these two people that Martin was made at, just for alarm [a lark?]. I mean, for no apparent reason. So both of them were acting stupidly or inexplicably." *Id.* at 152.

**20.** *Lumpkin* does not stand for the proposition that the codefendant's testimony must "fully" exonerate a defendant seeking a severance. The court stressed that the defense attorney conceded this fact, and held that there was no error because the proffered "exculpatory" information was so vague. 586 A.2d at 706–08. That is not true in the present case.

of the evidence is spent, the proposition for which it is offered still can seem quite improbable. Thus, the common objection that the inference for which the fact is offered "does not necessarily follow" is untenable. It poses a standard of conclusiveness that very few single items of circumstantial evidence ever could meet. A brick is not a wall.

EDWARD W. CLEARY, *et al.*, McCORMICK ON EVIDENCE § 185, at 542–43 (3rd law. ed. 1984).

It is difficult to disagree with the judge's view that Brandon would not have made a very compelling witness. He effectively admitted at his plea that his claims of self-defense, asserted both in his statement to the police and in his counsel's opening statement at trial, were false. He acknowledged that, contrary to his initial account, Gray did not pull a handgun on him at the crime scene. He contradicted himself during the plea proceeding as to the time and location of the shooting, and he initially either forgot or declined to mention the intervening ride in the automobile. According to counsel for Martin, Brandon even claimed in one of his statements that he had an alibi.

It should be noted, however, that the principal inconsistencies between his plea and his earlier versions related to his initial self-serving claim that he was attacked at the murder scene and fought back. A defendant might well lie to conceal his own guilt, but nevertheless tell the truth with respect to other matters. Brandon has, so far as can be discerned, been consistent on the one issue of prime significance to the case against Martin, namely, that Ms. Sto-ver set him up [21] and that Gray and Pegues robbed him.

█ In any event, the question of Brandon's credibility was for the jury, not the judge. In *King, supra,* the prosecution made what we described as an "impressive case for the proposition that Manning [Ms. King's codefendant] would have been a vulnerable defense witness, and perhaps a potential feast for an astute cross-examiner." 550 A.2d at 356. We added that "[i]t may well be that the jury would not have believed Manning . . ., but the problem is that we will never know." *Id.* Quoting from *Davis v. Alaska,* 415 U.S. 308, 317, 94 S.Ct. 1105, 1111, 39 L.Ed.2d 347 (1974), we held that

> [w]e cannot speculate as to whether the jury, as sole judge of the credibility of a witness, would have accepted this line of reasoning had counsel been permitted to fully present it. But we do conclude that the jurors were entitled to have the benefit of the defense theory before them so that they could make an informed judgment as to the weight to place on Green's testimony. . . .

*King, supra,* 550 A.2d at 357. So, too, in *State v. Williams,* 200 Conn. 310, 317, 511 A.2d 1000, 1003 (1986), the court held, in a case somewhat resembling this one, that "[t]he state's claim at trial that this testimony [of the codefendant] was not true is not focal, because that issue is ultimately for the jury." [22]

It may be that, in these violent times, one man would insist on the execution of two others who had not shown him enough

---

**21.** Aside from its relevance to Martin's motive or the lack thereof, Brandon's plea testimony was potentially significant for another reason. In his brief, Martin argues quite plausibly that "[i]f, as Brandon believed, Stover had 'set up' Brandon to be robbed by Gray and Pegues, she was implicated in a crime herself and needed to steer the investigation away from any such robbery."

**22.** Citing all but the first five words of dictum in *Byrd v. Wainwright,* 428 F.2d 1017, 1021 (5th Cir.1970), that "[c]redibility is for the jury, but the judge is not required to sever on patent fabrications," the government claims that the trial judge could properly consider his own as-sessment of Brandon's credibility in ruling on Martin's motion for a mistrial. Even aside from our holding on this point in *King,* however, which the government does not address, there is no basis in this record for dismissing as "patent fabrication" Brandon's testimony that Gray and Pegues robbed him and that he acted to avenge himself rather than to punish unkind words uttered at Martin. That Brandon at first falsely denied his own guilt—an instinctive human reaction which we do not countenance but can surely understand—does not establish beyond peradventure that everything else he said was false.

respect,[23] and that a second man would do the first man's bidding for no better reason than that. A reasonable jury could find it to be at least as likely, however, that the killer acted to avenge himself for the travail and humiliation he suffered when he (and not someone else) was tricked and robbed. When the jury has not been told of such alternative potential motivation, the record is, in our view, insufficiently complete to permit the kind of informed determination by the trier of fact which is at the heart of our system of justice. Accordingly, we conclude that Brandon's testimony had substantial exculpatory potential.

### D. The desire of the movant to present the defendant's testimony.

▮ Beginning with his pretrial motion and continuing throughout the trial, Martin urged the judge to grant a severance and, eventually, a mistrial to enable him to present Brandon's testimony. Indeed, the undiminished intensity with which his counsel pressed the point became discernably irritating to the judge.

After the judge declined to order a mistrial, Martin's counsel requested that the prosecutor grant Brandon immunity so that Brandon could become a defense witness. Counsel also asked that the judge "order the government to go through [unspecified] procedures" to bring this about.[24] The judge declined to involve himself in the matter, however, stating that he lacked authority and that "it's not appropriate in this case because, frankly, I think that Mr. Brandon lied during his plea proceeding."

When neither a mistrial nor a grant of immunity was forthcoming, Martin's counsel requested that "Mr. Brandon's plea statement taken under oath be admitted as evidence in this case and disclosed to the jury." The judge ruled, however, that the testimony was inadmissible because the prosecution had not had an opportunity to cross-examine Brandon.[25]

It is difficult to conceive of a case in which a defendant attempted more consistently and more vigorously to present his codefendant's testimony. The record is thus favorable to Martin with respect to the second *Jackson* criterion.

### E. The availability of the codefendant's testimony.

Arguing that a mistrial should not be granted "where the possibility of the codefendant's testifying is merely colorable or there is no showing that it is anything more than a gleam of possibility in the defendant's eye," the government maintains that Martin has not satisfied the third *Jackson* prong. We do not agree.

▮ "[T]he public … has a right to every man's [or woman's] evidence, except for those persons protected by a constitutional, common-law, or statutory privilege." *United States v. Nixon*, 418 U.S. 683, 709, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974) (citations and internal quotation marks omitted). Courts are especially solicitous, as we have noted, in protecting the right of a criminal defendant to present witnesses

---

23. "Dissed" or "disrespected" him, in the language of the street.

24. As Martin's counsel recognized, the trial judge had no authority to order the prosecutor to grant Brandon immunity. *Compare Wilson, supra* note 17, 558 A.2d at 1140–41 n. 9, *with Government of Virgin Islands v. Smith,* 615 F.2d 964, 968 (3d Cir.1980). The judge may, however, seek a commitment from the appropriate prosecuting authority not to bring charges against the witness. *Wilson, supra,* 558 A.2d at 1140; *Davis v. United States,* 482 A.2d 783, 785 (D.C.1984).

   As we noted in *Wilson, supra,* 558 A.2d at 1140, conflicts often arise when the government refuses to provide immunity, or a less formal promise not to prosecute, to an individual who, from a common sense perspective, appears un-

likely to be prosecuted in the normal course of events. Such a refusal can deny a defendant, for no apparently cogent reason, the opportunity to present exculpatory testimony. Brandon having already entered a plea to a life offense (second-degree murder while armed), the prosecutor could arguably have granted Brandon use immunity or some similar benefit, thus enabling Martin to call Brandon as a witness, without significantly impairing any legitimate law enforcement interest.

25. Martin's counsel did not raise, either at trial or on appeal, the question whether the plea proceeding was admissible as an admission against penal interest. *See Laumer v. United States,* 409 A.2d 190, 194–99 (D.C.1979) (en banc).

in his own defense. *King, supra,* 550 A.2d at 353. Once Brandon was sentenced—an event which has now occurred—he no longer had a Fifth Amendment privilege. *Tucker, supra,* 571 A.2d at 799. Accordingly, Brandon became subject to subpoena by the defense as soon as he had been sentenced.

██ At his plea, Brandon gave sworn testimony which we have held to be exculpatory as to Martin.[26] Under these circumstances, we do not agree with the government that it was also incumbent upon Martin to proffer an affidavit from Brandon proclaiming that he would give evidence at a subsequent trial of Martin alone. Even if Brandon were unwilling to testify voluntarily—and there is no evidence that, once sentence had been imposed, he would have been recalcitrant—it is sufficient that compulsory process was available, so that the judge could have ordered that Brandon testify. To put it in the vernacular, a subpoena does not say please. Since Brandon could be required to give evidence, Martin's constitutionally based right to present testimony cannot reasonably be made to depend on whether Brandon is eager or reluctant to tell his tale. Contrary to the government's position, nothing in *King,* or in *Lumpkin* (which quotes from *King*), was intended to make such a basic right contingent on a codefendant's personal caprice.[27]

### F. The demands of judicial administration.

██ If a mistrial had been granted, it would have been necessary to begin Mar-

tin's trial all over again. The prosecution witnesses would have been required to tell a second jury about the events which they had already related to the first. The judge, (new) jurors, and counsel would all have been subjected to unanticipated burdens on their time. Obviously, in a crowded urban court in which, among other things, incarcerated but presumptively innocent defendants are awaiting their turn to be tried, such duplication ought to be avoided if this can be accomplished without denying Martin his rights.

Nevertheless, we substantially agree with the treatment of the "judicial economy" issue in Martin's brief:

> The final *Jackson* factor, the demands of effective judicial administration, should have been a [comparatively][28] weak consideration and certainly did not outweigh all three of the previous factors. The efforts of the first trial were not completely wasted, because it resulted in a disposition of one of the two defendants. Additionally, while two weeks had been invested in appellant's trial at the time of Brandon's plea, one of the two weeks was spent in pre-trial motions hearings which would not have to be repeated at a second trial. Even if a "waste" of one week of trial were significant,[29] [nevertheless], given the magnitude of appellant's constitutional interests and the strength of the other three factors, the trial court should have granted the mistrial motion.

Moreover, "[t]his case demonstrates once again that the shortest way around is often

---

**26.** Brandon's clear articulation of his motive differentiates this case from *Lumpkin* and from *King,* in which severance motions were properly denied because the defendants were unable to provide the substance of their codefendant's purportedly exculpatory proposed testimony.

**27.** The court's use of the word "willingness" in these cases cannot take the government where it proposes to go. The distinction between willingness to testify and amenability to process to require a witness to testify was not at issue. If it had been, it is inconceivable that the court would have held insufficient the availability of a codefendant's compelled testimony. We note that, in both cases, the court placed the burden on the defendant to show "that the codefendant

is, in fact, *likely* to testify." *King, supra,* 550 A.2d at 352; *Lumpkin, supra,* 586 A.2d at 707 (emphasis added). That likelihood is surely present when the witness is under subpoena.

**28.** We have added the word "comparatively" to achieve greater measure of balance.

**29.** We *disagree with any intimation by counsel* for Martin that the waste of a week of a busy felony judge's time is not significant. Other cases were waiting to be tried; justice delayed is justice denied. When a defendant is on trial for his liberty, however, his right to call a potentially exculpatory witness is, at least on these facts, even more important.

the longest way through." *Burns v. Thiokol Chem. Corp.*, 483 F.2d 300, 302 (5th Cir.1973) (citation and internal quotation marks omitted). In *Burns*, the trial judge, apparently attempting to expedite an employment discrimination case, sharply restricted the plaintiff's discovery. Following a trial on the merits, the judgment was reversed on appeal because of the erroneous restriction. The "good judicial husbandry," *United States v. Dogan*, 314 F.2d 767, 772 (5th Cir.1963), which had doubtless been the trial judge's goal was therefore never achieved.

In the present case, as in *Burns*, the judge's refusal to declare a mistrial will now require a second presentation not only of the prosecution case, but of the defense case as well. Closing arguments, the trial judge's charge, and jury deliberations will have to be repeated too. There will be more duplication, not less, than would have occurred if Martin's motion had been granted.

The trial judge had no crystal ball. He could not read appellate minds in advance. He could only call the shots as he saw them. It is no reflection on any trial judge, who must rule almost immediately, with limited opportunity for reflection, that an appellate court, which has far more opportunity for research and deliberation, ultimately reaches a different conclusion. But where, as here, a defendant's right to present his defense is implicated, it is worth noting that if the judge gives primacy to the public interest in judicial economy, arguably at the expense of the defendant's rights, there is always the risk that his or her ruling will assure neither.

■ Considering all of the *Jackson* factors together, we are of the opinion that the trial judge accorded too little (if any) recognition to Martin's right to present his defense, and (perhaps understandably after devoting two weeks to a case), overemphasized the short-term demands of judicial economy. Judge Wagner, in dissent, emphasizes that the judge's decision with respect to the motion for a mistrial was confided to his discretion, and we agree that we may review the judge's exercise of that

discretion only for abuse. Judicial discretion must, however, be founded upon correct legal principles. *In re J.D.C.*, 594 A.2d 70, 75 (D.C.1991). The trial judge having either altogether ignored Martin's constitutionally-based right to present exculpatory testimony, *see J.D.C. supra*, 594 A.2d at 75, or at the least substantially underweighed it, *see King, supra*, 550 A.2d at 353, his exercise of discretion rested on a legally infirm foundation and cannot be sustained. As a result, Martin was denied the fair trial which was his constitutional due. *See Williams, supra*, 200 Conn. at 317–21, 511 A.2d at 1003–06.

## III

## OTHER ISSUES

In light of our disposition, the remaining issues raised by Martin can be addressed briefly. We deal with them only to the extent necessary in order to enable the trial court to conduct the retrial on remand.

### A. The evidence of prior possession of handguns.

■ Martin contends that the trial judge erred in admitting as "other crimes" evidence presumptively barred by *Drew v. United States*, 118 U.S.App.D.C. 11, 331 F.2d 85 (1964), and its progeny, testimony by Ms. Stover and Ms. Easterwood that they had seen handguns at Martin's apartment on previous occasions. We have held that possession of such weapons, without more, is not wrongful conduct subject to the strictures of *Drew*. *See Ali v. United States*, 581 A.2d 368, 375 (D.C.1990), *cert. denied*, — U.S. —, 112 S.Ct. 259, 116 L.Ed.2d 213 (1991). Moreover, "[a]n accused person's prior possession of the physical means of committing the crime is some evidence of the probability of his guilt, and is therefore admissible." *Coleman v. United States*, 379 A.2d 710, 712 (D.C. 1977).

Here, Martin's state of mind when he allegedly directed Brandon, upon their return from the liquor store to Trenton Park, to "get it" or "get the things," is potentially illuminated by the testimony that weap-

ons were in the apartment. That he had handguns at his home makes it more likely that the "things" (or "it") to which he referred were handguns. There was no error in the admission of the evidence.

### B. The aiding and abetting instruction.

Martin contends that the trial judge's supplemental instruction as to aiding and abetting "eliminated the distinction between aiding and abetting and accessory after the fact." According to Martin, the instruction did not require the jury to find that Martin intended, *prior to the shooting,* to have Brandon kill Gray and Pegues. The government responds that, properly understood, the supplemental instruction was consistent with that requirement.

The prosecution and defense agree that to convict Martin as an aider or abettor, the government must show that the proscribed intent was formed before Brandon fired at Gray. They also agree that the jury may consider Martin's subsequent conduct to the extent, if any, that it sheds light on his state of mind prior to the shooting. Since a new trial is being ordered for other reasons, we need not join the parties in a dissection of the trial judge's supplemental instruction. Rather, we simply direct that, on retrial, the jury be clearly instructed in conformity with these principles.[30]

### IV

### CONCLUSION

For the foregoing reasons, Martin's convictions must be and each is hereby reversed, and the case is remanded for a new trial.

*So ordered.*

---

**30.** We view as altogether devoid of merit Martin's contention that the trial judge should have ruled in advance on the permissible scope of cross-examination if Martin should decide to testify during the hearing on his motion to suppress identification, statements and evidence. Until he had heard the direct evidence, the judge was in no position to determine what examination would be proper to test Martin's credibility.

**WAGNER, Associate Judge, dissenting:**

In my opinion, the trial court did not abuse its discretion in denying appellant's motion for a mistrial, which he requested to afford him an opportunity to call as a witness his co-defendant, Stephen Brandon. The co-defendant had entered a plea of guilty after completion of the government's case. The record belies any claim that appellant was entitled to a mistrial or that the interests of justice would be served by a retrial. I agree with my colleagues that *Jackson v. United States,* 329 A.2d 782 (D.C.1974), *cert. denied,* 423 U.S. 851, 96 S.Ct. 95, 46 L.Ed.2d 74 (1975), governs the disposition of the issues before the court. However, it is the application of the *Jackson* criteria to the facts in this case which invites this dissent. Two of the four *Jackson* factors,[1] "the exculpatory nature of the desired testimony" and "the demands of effective judicial administration," weighed against the trial court's exercise of discretion in appellant's favor, in my view.

It is well settled that the trial court has broad discretion to grant or deny a severance request or a mistrial motion based on a defendant's desire to present at his trial the testimony of a co-defendant. *Tucker v. United States,* 571 A.2d 797, 800 (D.C. 1990); *King v. United States,* 550 A.2d 348, 352 (D.C.1988). This court's review of the trial court's discretionary ruling "is limited to a determination whether [its] discretion was abused." *King,* 550 A.2d at 352; *see Jackson, supra,* 329 A.2d at 732 (abuse of discretion finding requires determination that joint trial resulted in denial of a fair trial and due process). Measured against that standard, I cannot agree that the trial court did not act within its broad discretion in denying the motion.

I share the majority's view that the factors which govern the disposition of a

Such decisions cannot be made in a vacuum, and Martin has presented no authority to support his theory that the judge is compelled to rule on a hypothetical record rather than on an actual one.

**1.** *Jackson, supra,* 329 A.2d at 788.

mistrial motion based on the desire to obtain purportedly exculpatory testimony of a co-defendant apply equally to the determination of a severance motion on the same grounds. Those factors are:

> the exculpatory nature of the desired testimony, the desire of the movant to present this testimony, the willingness of the co-defendant to testify, and the demands of effective judicial administration.

*Jackson, supra,* 329 A.2d at 788. A bald assertion that exculpatory testimony will be forthcoming is insufficient to trigger the favorable exercise of the court's discretion. Rather, a defendant has the burden of demonstrating that the testimony of the co-defendant would be exculpatory in effect. *Lumpkins v. United States,* 586 A.2d 701, 707 (D.C.1991) (quoting *King, supra,* 550 A.2d at 352). Appellant failed to carry that burden, in my opinion.

The substance of the testimony which appellant sought to present surfaced during the co-defendant's plea proceeding. As the majority correctly observes, that testimony "was not conclusively exculpatory as to Martin. Indeed it placed Martin in the car at the murder scene."[2] Beyond that, Brandon's plea testimony corroborated the testimony of other government witnesses concerning appellant's role as driver of the vehicle during the commission of the crimes. According to Brandon, and other government witnesses, appellant drove Brandon to the scene of the shooting, stopped the car near the victims after they were spotted, and allowed Brandon to get out of the car whereupon he shot and killed Clayton Gray.[3] According to appellant's own testimony, he had to execute a "U-turn" of the vehicle to facilitate Brandon's encounter with the victims after someone said, "Stop" and "There they go." During the plea proceeding, Brandon provided no testimony, nor did appellant proffer that Brandon could do so, that appellant's participation in furthering the success of the crime was other than knowingly and with the intent to bring the crime about. *See Hackney v. United States,* 389 A.2d 1336, 1342 (D.C.1978).[4] Thus, rather than providing exculpatory evidence, Brandon presented inculpatory evidence against appellant.

The majority's conclusion as to the exculpatory potential of Brandon's testimony is based upon Brandon's disclosure of his personal motive for the crimes given during his plea. Brandon testified that he killed Gray and shot at Pegues because they robbed him on an earlier occasion. Although this motive provides a more plausible basis for Brandon's participation in the crimes, it does not negate the evidence that appellant also had a separate, independent motive for assisting in the commission of the offenses.[5] Indeed, appellant de-

---

**2.** Majority opinion at 128.

**3.** The pertinent portion of Mr. Brandon's statement given under oath at the plea proceeding was as follows:

> Q. So what happened?
> A. So half a block, like approximately a block-and-a-half, got in the car, drove the car up there.
> Q. Who got in the car?
> A. Paul Simms and Martin, Tyrone Martin and Valencia, and that was it. Then Valencia told him to stop.
> Q. Valencia what?
> A. Valencia told Paul Simms, I mean Peter, [referring to appellant] to stop the car. She pointed the guys out and that is when he stopped the car, and that is when I jumped out and I shot him.

**4.** In addition to this evidence, the government presented evidence tending to show that appellant had a heated encounter with the victims just prior to the shooting, threatened them, and drove Brandon to an apartment to obtain a gun before returning to find the victims. When they located them, appellant stopped the car, and Brandon got out and killed Mr. Gray and shot at Marvin Pegues.

**5.** The majority observes that a jury might find it improbable that Brandon acted independently of appellant, "an older relative," if he acted because of appellant's anger toward the victims. While recognizing on the one hand that Brandon could act in concert with Martin to facilitate Martin's revenge, they find it implausible that Martin could be motivated by the same desire to aid a relative in avenging a wrong. Thus, the majority suggests that it would not have been appellant's affair if Brandon did the shootings because of the earlier robbery. However, it is no less plausible that appellant might have assisted his younger relative because he was the victim of a robbery, than that the younger relative would have assisted appellant because of the insult to the latter's manhood.

scribed an encounter with the decedent that evening at the liquor store which left him irritated even though he denies that an argument occurred. That Brandon may have had a motive to shoot the victims does nothing to dispel the evidence that appellant also had an argument with them prior to the shooting and that he threatened them for that reason. The motives of joint participants in a criminal venture are frequently entirely different. Moreover, absent from Brandon's potential testimony is any evidence that appellant lacked a motive to assist Brandon as the evidence shows he did.

The nature of the exculpatory testimony proffered is important in balancing the *Jackson* factors. *See United States v. Ford,* 276 U.S.App.D.C. 315, 317, 870 F.2d 729, 732 (1989) (after threshold showing, trial court must examine "the significance of the testimony in relation to the defendant's theory of the case"). Denial of a continuance where a defendant proffered that its purpose was to secure testimony which would exonerate him has been found to be an abuse of discretion. *Tucker, supra,* 571 A.2d at 800. However, in this case, Brandon's testimony would not have exonerated appellant. Where the proffered testimony would have refuted testimony bearing on the issue of premeditation, this court found no abuse of discretion in the trial court's denial of a continuance to secure that testimony where the co-defendant could not offer testimony exculpatory to the shooting itself. *Jackson, supra,* 329 A.2d at 788. Here, the testimony of Brandon was not as directly pertinent to appellant's innocence as the testimony in *Jackson.* The proffered testimony must do more than contradict the details of the government's case. *United States v.*

*Flick,* 719 F.2d 246, 249 (7th Cir.1983). Not only did Brandon's plea testimony not contradict the government's case, it tended to support it. The decision of the trial court to deny severance to obtain exculpatory testimony from a co-defendant should not be overturned where references to appellant's lack of involvement "are not necessarily exculpatory." *Ford,* 276 U.S.App. D.C. at 318, 870 F.2d at 732. Appellant has failed "to meet the burden of establishing with requisite specificity the exculpatory 'nature and effect' of his co-defendant's testimony." *Id.* (quoting *United States v. Parodi,* 703 F.2d 768, 780 (4th Cir.1983)). Therefore, I would find no abuse of discretion in the trial court's decision not to abort the trial on its eighth day after completion of the government's case.

Another factor considered by the trial court in exercising its discretion, which the majority rejects, deserves comment. The extent to which a co-defendant's testimony would be subject to impeachment is pertinent to consideration of a severance request premised on the movant's need for a co-defendant's testimony. *See id.* 276 U.S.App.D.C. at 318–19, 870 F.2d at 732–33.[6] Thus, Brandon's many inconsistent versions of the events was an appropriate consideration in determining whether to grant a mistrial.[7] *See Byrd v. Wainwright,* 428 F.2d 1017, 1021 (5th Cir.1970). A finding of abuse of discretion requires a determination that denial of the mistrial to secure the co-defendant's testimony deprived appellant of a fair trial and due process. *See Jackson, supra,* 329 A.2d at 787. The extent to which the missing testimony is subject to substantial impeachment undercuts the claim that the trial was unfair without it. Therefore, it is a factor which should be weighed in any determina-

---

**6.** In the federal circuits, once a defendant makes a threshold showing for severance based on the need for a co-defendant's testimony, the trial court must then

(1) examine the significance of the testimony in relation to the defendant's theory of the case; (2) assess that extent of prejudice caused by the absence of the testimony; (3) consider the effects on judicial administration and economy; and (4) give weight to the timeliness of the motion.

*Ford, supra,* 276 U.S.App.D.C. at 317, 870 F.2d at 731 (citations omitted).

**7.** At the beginning of the plea proceeding, Brandon claimed that he shot the victims in self-defense at a different location. Prior to trial, Brandon allegedly provided "a set of false alibis for himself and for (appellant)," according to appellant's counsel. He also gave an earlier account in which he took responsibility, but did not mention self-defense.

tion regarding whether the trial court abused its discretion in denying a mistrial on these grounds.

In summary, appellant's failure to meet the threshold burden of showing that his co-defendant could offer on appellant's behalf exculpatory testimony is sufficient to defeat the claim that the trial court abused its discretion in denying a mistrial. Even if the statements made by Brandon at the plea proceeding were somewhat useful to appellant, their value to appellant would have been undercut by the significant impeachment to which Brandon's testimony would be subject. These factors had to be balanced by the trial court against the "demands of effective judicial administration." *Id.* at 788. The latter factor should be given significantly more weight after trial had progressed toward completion than when in a pretrial posture. In my opinion, the trial court properly weighed that factor in the context of this case. Considering all of the foregoing circumstances, I cannot agree that the trial court abused its considerable discretion in denying the mistrial request nor that appellant was denied a fair trial by virtue of the decision. Therefore, I respectfully dissent.

Before ROGERS, Chief Judge, FERREN, TERRY, STEADMAN, SCHWELB,* FARRELL,** WAGNER,* KING, and SULLIVAN, Associate Judges, and PRYOR,* Senior Judge.

## ORDER

PER CURIAM.

On consideration of appellee's petition for rehearing or rehearing en banc, and the answer thereto, it is

ORDERED by the merits division * that the petition for rehearing is denied; and it appearing that the majority of the judges of this court has voted to deny the petition for rehearing en banc, it is

** Associate Judge Farrell has recused himself from these cases.
  Associate Judge Wagner voted to grant the petition for rehearing.

FURTHER ORDERED that the petition for rehearing en banc is denied.